*In re* MARRIAGE OF LISA STAHL, Petitioner-Appellant, and CARL DeLEO, Respondent-Appellee.

Second District  No. 2—03—1071

Opinion filed May 19, 2004.—Rehearing denied June 16, 2004.

BOWMAN, J., dissenting.

Steven N. Peskind, of Law Offices of Steven N. Peskind & Associates, of Geneva, for appellant.

William F. Bochte, of Bochte & Kuzniar, P.C., of St. Charles, for appellee.

JUSTICE GILLERAN JOHNSON delivered the opinion of the court:

The petitioner, Lisa Stahl, appeals from the August 27, 2003, order of the circuit court of Kane County denying her petition to remove her children and those of the respondent, Carl DeLeo, to Wisconsin. On appeal, Lisa argues that (1) the trial court's decision was against the manifest weight of the evidence and (2) the trial court erred in requiring her to demonstrate the direct benefits that her children would experience by moving to Wisconsin. We affirm.

The parties' marriage was dissolved on December 13, 2000. Pursuant to the order of dissolution, Lisa and Carl were awarded joint custody of their children: Christiana, born July 22, 1994; and Tony, born May 6, 1996. On April 16, 2002, Lisa filed a petition seeking to remove Christiana and Tony to Cedarburg, Wisconsin, a town 20 miles north of Milwaukee.

On August 19, 2003, the trial court conducted a hearing on Lisa's petition. Lisa testified that, prior to the divorce, she began operating a business with Allen Hansen, Hansen Stahl Sales and Marketing (HSSM). Hansen originally started the business in 1996 as Allen Hansen & Associates in Grafton, Wisconsin. HSSM provides sales

representatives for several small manufacturing companies. Most of their clients and customers are located in Wisconsin, but they do have a limited number of Illinois-based clients and customers. Until recently, HSSM maintained offices in Geneva, Illinois, and Grafton, Wisconsin. Lisa ran the Geneva office and Hansen managed the Grafton office. When Lisa and Hansen first started HSSM, Lisa, who was still married to Carl at the time, could not move to Wisconsin because Carl's position as a fireman required him to maintain Illinois residency. Most of the main business functions were carried out at the Grafton office. At the Geneva office, Lisa performed duties related to the accounts entrusted to her care. A full-time office manager operated the Grafton office, while two part-time employees performed administrative duties at the Geneva office.

Apparently beginning sometime in 1999, Lisa and Hansen's business relationship evolved into a romantic relationship. Lisa described her relationship with Hansen in the following words:

> "It's a wonderful relationship. It is truly great to have a partner that works with me on day-to-day issues with the children and responsibilities, and I'm very much in love with him, and pending the decision, I'm hoping we'll be able to marry."

Hansen is divorced and has two children, 14-year-old Christopher and 10-year-old Nicholas. Hansen has spent time with Lisa's children and, according to Lisa, has developed a close relationship with them. If allowed to move, she intends to purchase a house in Cedarburg, Wisconsin. Cedarburg is just a few minutes' drive from HSSM's main office in Grafton.

Lisa believes that operating two separate offices has caused HSSM several problems. Lisa and Hansen have trouble coordinating and communicating between the offices on client matters. In many instances, they had trouble when they attempted to meet with vendors or clients at the same time.

Lisa testified that there are a couple of different parts of Carl's visitation schedule. First, Carl and Lisa have alternated their visitation with the children on holidays such as Christmas. The second part of the scheduling is more irregular. Carl is a fireman with the fire department in Woodridge. He works a "one day on, two days off" schedule that results in his working about 100 days a year. Carl gives his work schedule to Lisa about two or three months in advance and they then work out a visitation schedule for his days off work. His unique work schedule permits him to see the children about two to three days during the week, as well as on weekends, which amounts to about 10 daytime visits and 2 overnight visits each month. After Lisa filed her petition for removal, Carl made an effort to increase his

contact with the children. Lisa claims that she does whatever she can to foster the relationship between Carl and the children. She further tries to encourage the children to spend time with Carl's family, including their paternal grandparents. Lisa primarily oversees the children's education and health care, but acknowledged that Carl has become more involved since the removal petition was filed.

Lisa testified that she began thinking about moving to Wisconsin because she wanted to be closer to Hansen. She explained:

> "My relationship with Allen was growing, and we wanted to be able to be in the same area, we talked about getting married, we talked about the stresses of being single—myself being a single parent, taking care of the children, the house, and running the business in a separate location."

Lisa said that she then began looking into the schools and real estate in the area of Grafton. She consulted with the family's therapist, Valerie Jencks, to help determine if the children were ready for the move. She also spoke with her parish priests about parenting values and how to help the children move beyond the divorce.

According to Lisa, the move to Cedarburg would permit her to spend much more time with the children and avoid the need for a child care provider. She believes that the children could still have a "very good relationship" with Carl and visit with him on a regular basis. Lisa investigated the school in Wisconsin that the children would attend, St. Francis Borgia. She believes that St. Francis Borgia is better than the school the children currently attend in Illinois, St. Peter's. For instance, Lisa likes that the Wisconsin school has a full-time school counselor, offers foreign language classes, and serves "home-cooked" meals in the cafeteria.

The move to Wisconsin would permit her to remain at home until the children leave for school in the morning and also to be home when they return from school. She said that she would have significantly more time to spend with the children to help them with homework or take them to after-school activities. In the past, the children have been unable to participate in extracurricular activities. In Cedarburg, Lisa stated, Christiana would be able to participate in gymnastics at a local academy. Tony would be able to join the local children's ice hockey and basketball teams.

Lisa also has family living in Wisconsin. Her parents live approximately four hours away from Cedarburg, in Sayner.

Lisa and Hansen plan to purchase a house in Cedarburg. Hansen and his two children would move in with Lisa and her two children after Lisa and Hansen married. Thus, in their new family, Lisa believes that she and Hansen would be able to pool their finances and share

their child-rearing obligations. Moreover, Lisa believes that they would have more flexibility in coordinating their daily lives, given that Lisa and Hansen would be working in the same office.

Lisa also testified that she believes HSSM will experience substantial savings due to the consolidation of the business into a single location. She predicted that the move to Wisconsin would save HSSM about $35,000 annually.

Lisa testified that Carl drove for approximately 30 minutes when he traveled from his home in Woodridge to pick up the children from Lisa's former residence in Geneva. If Lisa moved to Cedarburg, a drive from Woodridge would take about two hours. However, Lisa testified that she has offered to arrange for Carl to pick up the children at Gurnee Mills Mall in Gurnee, Illinois. Under this arrangement, Lisa would drive the children to Gurnee Mills herself. From there, Carl's drive home to Woodridge would take about 45 minutes.

Lisa also testified about closing the Geneva office and selling her home in Geneva before the court ruled on her removal request. She claimed that she closed HSSM's Geneva office because financial pressures forced her to find a way to reduce costs. She further explained that she did not truly intend to sell the house before the court ruled on her removal request. However, the court date, she explained, was moved back several times and she had hoped to sell her home before the children started school in the fall. She placed the house on the market in May and it sold 10 days later. Therefore, when the hearing started in August, she had already sold her home.

In the event that her removal request was denied, Lisa testified that she planned to move to Lake Villa or Antioch. Carl's drive to pick up the children from either location would be about an hour. However, Lisa further planned to commute daily to the Grafton office, approximately a 75-minute drive. Lisa said that she would be gone each day from 8 a.m. to 6 p.m. The children would need to enter an after-school care program. Moreover, Hansen and Lisa's plan to marry would no longer be feasible. She claims that there are simply too many barriers preventing Hansen's and HSSM's relocation to Illinois.

On cross-examination, Lisa admitted that nothing in HSSM's operating agreement requires her to move to Wisconsin. She discussed how she occasionally goes on overnight business trips that may extend up to two or three days. She believes that these trips would become much less frequent if she were allowed to move to Wisconsin. Lisa testified that the Geneva office was operated from an office she had set up in her home. She had agreed with Hansen that she would work each day at least from 8 a.m. to 5 p.m. Thus, she would be at the house most of the day unless she was visiting clients or vendors, or

traveling out of town. While working from her home office in Geneva, she was generally around when the children left for school and when they returned home. She claimed that, even though she was home when the children arrived home from school at 3 p.m., she was not "available for them" until at least 5 p.m. At the Grafton office, her work hours would be 9 a.m. to about 3:15 p.m. In Cedarburg, Lisa would be able to focus her full attention on the children. The situation would be "very different" than it was in Geneva.

Lisa testified that there is no statistical data available on St. Francis Borgia, the Cedarburg grammar school, pertaining to such things as the college matriculation rate or average SAT scores of its graduates. Lisa described each of her children as bright and said they are doing well in school. Christiana usually receives "straight A's and some B's."

Lisa acknowledged that Carl often visited with the children during the week on days he was not working. Typically, he would pick the children up after school at 3 p.m. and then drive them back to Woodridge. He would then drive back to Geneva and drop them off at Lisa's house at 7:30 p.m. She does not believe that this type of visitation would have to cease if she moved to Cedarburg, which is over an hour's drive beyond Geneva. She proposed that Carl could simply travel up to Cedarburg and spend the time with the children there instead of taking them back to his home in Woodridge.

Finally, Lisa testified that, if compelled by the judgment, she could buy another house in Illinois. Lisa's income would not significantly change if she moved to Wisconsin. In 2001, her adjusted gross income was $230,310. Lisa claims that she does not have much discretionary monthly income and, currently, she can contribute only limited amounts to the children's educational fund. If her monthly expenses were lower due to sharing expenses with Hansen, she could contribute a greater amount to the children's educational fund. To her knowledge, Carl does not contribute any money toward the children's future education.

Allen Hansen testified that he currently resides in Cedarburg. He testified that, at one point, it made business sense to maintain an Illinois office. However, the Chicago market changed over time. In the past, HSSM maintained about eight accounts in the Chicago area, but that number has dwindled to about two or three. In addition, Hansen explained that the two offices were performing many redundant functions and, thus, incurring unnecessary costs.

Hansen further testified that he and his two children get along well with Lisa's children. In his view, he could not possibly move to Illinois.

Carl testified that he moved to Woodridge from Geneva in May 2002. He testified that he was not angry when Lisa filed for removal, but he was saddened by her actions. Carl denied that his challenge to Lisa's removal request was motivated by spite. He acknowledged, though, that he did not speak to Lisa about the possible benefits to the children if they moved to Cedarburg. He testified that Lisa was generally cooperative in terms of arranging visitation, except with regard to visitation around the holidays. Carl testified that he did not believe an arrangement could be created that would allow him to maintain a meaningful relationship with his children.

On cross-examination, Carl stated that the drive time between Woodridge and Cedarburg is approximately 2 hours and 20 minutes. In addition, Carl explained that occasionally he works as an arson investigator. Consequently, he must remain near Woodridge while on call.

Later, when Carl testified on his own behalf, he spoke in detail about the frequency of his visits with the children. He averaged about 10 daytime visits and 2 overnight visits each month. However, as 2002 progressed, his visits apparently increased by about 30%. As a fireman, Carl said, he has great flexibility in his work schedule. For instance, he often trades shifts with other firefighters. However, at times, Carl's additional duties as an arson investigator require him to be on call and restrict his ability to leave the Woodridge area.

Carl testified that the children often stay overnight with him when Lisa travels for work. On the days Carl visits with the children from 3 p.m. to 7:30 p.m., Carl either takes the children back to his home in Woodridge or meets them when their after-school activities have ended and then takes them to a restaurant for dinner. Carl has attended two "daughter-daddy dances" with Christiana since 2000. He explained that he attends parent-teacher conferences when he is told or learns about them. Moreover, Carl takes the children to various after-school activities and spends time with them bowling, sledding, and playing games.

If the removal request is denied and Lisa moves to Lake Villa, Carl stated that he also plans to move to Lake Villa, even though it would be about a one-hour drive to Woodridge. If the request is granted, Carl fears that the children will be "out of [his] life" and that he will lose the regular contact he has had with them. He claims that he does not have any objection to the children living with Allen Hansen.

On cross-examination, Carl acknowledged that he could move to Lake Villa if the children moved to Cedarburg. Then, he would be only about an hour's drive away from the children and also an hour away from his job. On the days he wanted to participate in the children's

activities, Carl acknowledged that he would be an hour away from the children instead of half an hour away. Carl further agreed that, on days he brings the children back to Woodridge after school and then returns them to Lisa's house, he drives a total of two hours to complete the trip. Thus, Carl's driving time would be approximately the same if he drove to Cedarburg and spent the evening with the children there. Carl also admitted that nothing would prohibit him from driving to Wisconsin on the days he does not work. Moreover, he acknowledged that he could continue to enjoy the majority of the activities he participates in with the children if the children lived in Cedarburg. However, he believes that it is in the children's best interests to live in the same community as their father.

Also, as part of Carl's case, Kim Lage testified that she worked for Lisa from November 2001 through May 2002, providing child care for Christiana and Tony. She said that some weeks she saw Carl at Lisa's house visiting the children two or three times during the week, but other weeks she did not see him at all. According to Lage, the children were always excited to visit with Carl.

Jeanne Alter, Christiana's third-grade teacher at St. Peter's, testified that Christiana is an excellent student. Alter testified that she saw Carl at the school either picking up or dropping off the children about once a week during the 2002-03 school year. One time, Carl spoke to Christiana's class about his job as a fireman. He also attended a parent-teacher conference. Alter's testimony indicated that Lisa principally oversaw the children's education. Lisa attended several school functions throughout the year.

Louis and Violet DeLeo, the children's paternal grandparents, from Downers Grove, both testified that they see the children about once a week. They spend time with the children doing various activities. The visits would occasionally occur during the week, and not just on the weekends. Louis and Violet indicated that Carl is very involved in the children's lives.

Finally, Lisa submitted Valerie Jencks's evidence deposition. Lisa initially contacted Jencks, a marriage and family therapist, in 2001 to assist her in addressing Tony's aggressive behavior toward other children. Jencks met with Lisa and Tony five times in April and May 2001.

Lisa contacted Jencks again in July 2001. This time, Lisa hoped that Jencks could help the children cope with the divorce. Christiana was experiencing "moments of being quiet." Tony continued to have occasional outbursts of anger.

Then, in early 2002, Lisa sought to bring the children back into therapy because she wanted to talk about the possible move to

Wisconsin. According to Jencks, Lisa worried that Carl might contest removal. Thus, Lisa was concerned about the impact on the children and wanted a safe and comfortable place for them to express their feelings. Jencks stated that the children were initially excited about the prospect of moving but eventually became averse to the idea. They feared that Carl might be unhappy if they moved too far away. However, the children later changed their view and once again became excited about the prospect of moving.

Lisa again contacted Jencks in the spring of 2003 because she believed the litigation involved in advancing her removal request might be adversely affecting the children. During Jencks's sessions with the children, they told her that they were upset because their parents continuously fought over Lisa's plan to move. The children also worried that Carl would become angry and not want to visit them if they moved to Wisconsin.

Jencks stated that she was unwilling and unable to give a recommendation as to whether the move to Wisconsin was in the children's best interests. However, according to Jencks, the types of behaviors and feelings exhibited by the children are typical in children with divorced parents. Jencks believed that the move to Wisconsin would not be harmful to the children. Jencks opined:

> "[A] move of an hour and a half away from their father, provided that a specific predictable routine of visitation *** were to be preserved and followed through on, I think that these children are capable of adjusting to being an hour and a half away from their father, providing that there be a regular routine visitation."

At the close of the hearing, the trial court denied Lisa's removal request. The trial court explained in a written order:

> "The evidence in this case is mixed at best. Mr. DeLeo has a unique work schedule that allows him extensive opportunities for visitation. Ms. Stahl states that despite this unique situation he moved from Geneva to Woodridge. She also states that his visitation increased substantially after the filing of the removal petition. This evidence would seem to indicate that his resistance to the move is predicated on his own selfish desires and not the best interests of the children.
>
> Ms. Stahl argues that the move would benefit her by enabling her to consolidate her business and save money. She would also be free to marry her friend and business partner and start a new family. Her *primary* motive would thus appear to be her own happiness and gratification.
>
> The court does not believe that either party has impure motives, but does believe, based upon the evidence, that they have each been spurred on in this litigation by a desire to improve his or her

own life, rather than by an objective view of the best interests of the minor children.

Based upon the evidence heard in this matter, this court does not believe that Ms. Stahl has met her burden of proof with respect to this proposed move. There is no substantial evidence of enhancement in the quality of the lives of the children either directly or indirectly. Additionally, there is no proof that there can be formulated a visitation schedule for Mr. DeLeo that can be termed 'reasonable and realistic' as required by the case law.

Finally, there is evidence in the record that the litigation process itself has caused palpable harm to these children. They are confused and unhappy about the prospects of this move. This fact buttresses the court's conclusion that a move to Wisconsin as suggested by Ms. Stahl is not in the best interests of these children." (Emphasis in original.)

Following the trial court's ruling, Lisa filed a timely notice of appeal.

■ Under section 609(a) of the Illinois Marriage and Dissolution of Marriage Act (the Dissolution Act) (750 ILCS 5/609(a) (West 2002)), a trial court may approve a custodial parent's removal of the minor children from Illinois only when the removal is in the children's best interests. The burden of proving that such removal is in the children's best interests is on the party seeking removal. 750 ILCS 5/609(a) (West 2002). A determination of the children's best interests cannot be reduced to a simple bright-line test but rather must be made on a case-by-case basis, depending to a great extent upon the circumstances of each case. *In re Marriage of Eckert*, 119 Ill. 2d 316, 326 (1988). A trial court's determination of what is in the children's best interests should not be reversed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred. *Eckert*, 119 Ill. 2d at 328.

■ In *Eckert*, 119 Ill. 2d at 326-27, the supreme court identified five factors that should be considered in determining whether removal is in the children's best interests. Those factors are (1) whether the proposed move will enhance the quality of life for both the custodial parent and the children, (2) whether the proposed move is a ruse designed to frustrate or defeat the noncustodial parent's visitation, (3) the noncustodial parent's motives in resisting removal, (4) the noncustodial parent's visitation rights, and (5) whether a reasonable visitation schedule can be worked out. *Eckert*, 119 Ill. 2d at 326-27. A reasonable visitation schedule is one that would preserve and foster the children's relationship with the noncustodial parent. *Eckert*, 119 Ill. 2d at 327.

■ Applying these factors to the instant case, we cannot say that the trial court's decision was against the manifest weight of the

evidence when it denied Lisa's petition to remove the children to Wisconsin. As to the first *Eckert* factor, the record reveals that Lisa's life would likely be somewhat enhanced if she moved to Wisconsin. Due to the closing of her office in Illinois, Lisa would be working in Wisconsin. Thus, her work commute would be shorter if she were allowed to move to Wisconsin. By moving to Wisconsin, Lisa could also marry someone with whom she is "very much in love." By doing so, she could pool resources with her new husband and thus have more expendable income for herself.

As for the children, the record is mixed as to whether a move to Wisconsin would enhance their lives. The children would be transferred to another private Catholic school, comparable to the one that they would be leaving. The only distinctions that Lisa was able to draw between the schools were that the Wisconsin school offered foreign language classes, its cafeteria served "home-cooked" meals, and it had a full-time counselor.

By moving to Wisconsin, the children would be part of a new combined family. Lisa explained that if she moved to Wisconsin, she would marry Allen Hansen and she and the children would live with him and his two children. By doing this, Lisa would have more expendable income to spend on the children. However, the record is not clear as to what effect Lisa's new relationship with Hansen would have on the children. Thus, the record is mixed as to whether this new living arrangement would be in the children's best interests.

Moreover, it is clear that by moving to Wisconsin, the children's relationship with Carl would be adversely affected. Due to the limited hours he works, Carl has been able to visit with the children several times during the week. He has averaged 10 daytime visits with the children and 2 overnight visits with them each month. Due to his flexible hours, Carl has been able to frequently pick up the children after school. He has also been able to take them to various after-school activities and spend time with them bowling, sledding, and playing games. The children have also been able to have weekly visits with their paternal grandparents. If the children were to move to Wisconsin, this would necessarily impede Carl's ability to spend as much time with his children. This fact would not be in the children's best interests.

We also note that the record reveals that the children would likely be able to spend even more time with Carl if the removal petition was denied. Lisa testified that if the removal petition was denied, she would move to Lake Villa or Antioch. Carl testified that if Lisa moved to that area, he would also move to Lake Villa. As such, Lisa and Carl would be living in the same town or in general proximity to each

other. Such a living arrangement would greatly facilitate Carl's ability to visit the children on a regular basis. Carl could also provide greater assistance in picking the children up after school and taking them to more extracurricular events. As such, based on all of these facts, it appears that the children's lives would be most enhanced if Lisa's removal petition was denied and both Lisa and Carl moved to the Lake Villa or Antioch area.

As to the second and third *Eckert* factors, the trial court found that both Lisa and Carl were spurred on by a desire to improve their own lives rather than by an objective view of the best interests of the children. We note that, as the trier of fact, the trial court was in the best position to determine the credibility of the witnesses and to determine how much weight to place on their testimony. See *In re Marriage of Lee*, 246 Ill. App. 3d 628, 642 (1993). Accordingly, as we defer to the trial court's credibility determinations, the second and third *Eckert* factors do not weigh in favor of either party. See *In re Marriage of Parr*, 345 Ill. App. 3d 371, 378 (2003).

The final *Eckert* factors address Carl's visitation. As noted above, Carl has visited with his children frequently. He has taken full advantage of living in close proximity to them. For example, he has taken the children to after-school events and he has attended parent-teacher conferences. The record reveals that Carl will not be able to visit as frequently with his children if they move to Wisconsin with Lisa. These factors by themselves do not require that Lisa's removal petition be denied. See *Parr*, 345 Ill. App. 3d at 378 (trial court's concern about preserving the children's relationship with the respondent must be weighed against the enhancement of the quality of life for both the petitioner and the children). Nonetheless, considering all of the *Eckert* factors, we agree with the trial court that the evidence was mixed as to whether the children's lives would be enhanced by moving to Wisconsin with Lisa. Thus, we cannot say that the trial court's decision to deny Lisa's removal petition was against the manifest weight of the evidence.

■ In so ruling, we also reject Lisa's contention that the trial court erred in determining that removal was improper because she did not demonstrate that the children would experience any direct benefits by moving to Wisconsin. Lisa argues that the trial court's decision was in direct contravention of the supreme court's decision in *In re Marriage of Collingbourne*, 204 Ill. 2d 498 (2003).

In *Collingbourne*, the father argued that the trial court erred in granting the mother's removal request because she had failed to show that the child would reap any direct benefits by moving to Massachusetts. On appeal, the supreme court rejected this argument, find-

ing that a distinction between "direct" and "indirect" benefits that a child may incur in moving is not particularly helpful in making a determination whether removal is in the child's best interests. *Collingbourne*, 204 Ill. 2d at 525. The supreme court explained that " '[i]f only the direct benefits that affected children were considered, rarely would a situation arise where removal would be permitted where children were in a good environment with good schools, good parents, and good friends.' " *Collingbourne*, 204 Ill. 2d at 525, quoting *In re Marriage of Ludwinski*, 312 Ill. App. 3d 495, 499 (2000). Rather, the supreme court emphasized that the best interests of the child cannot be considered without assessing the best interests of the other members of the household in which the child resides, most particularly the custodial parent. *Collingbourne*, 204 Ill. 2d at 526.

Here, we do not believe that the trial court considered only the direct benefits the children would incur if Lisa's removal petition was granted. Rather, the record reveals that the trial court considered all of the possible benefits to the children and determined that there was "no substantial evidence of enhancement in the quality of the lives of the children either directly or indirectly." As such, Lisa's contention is without merit.

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

O'MALLEY, P.J., concurs.

JUSTICE BOWMAN, dissenting:

I respectfully dissent.

I believe that the majority has wrongly decided this matter. The trial court has failed to properly apply the supreme court's recent ruling in *In re Marriage of Collingbourne*, 204 Ill. 2d 498 (2003). Moreover, the trial court's findings are against the manifest weight of the evidence. I would reverse the trial court's denial of Lisa's removal request.

Section 609(a) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/609(a) (West 2002)) provides that a trial court may approve a custodial parent's removal of the minor children from Illinois when it is in the children's best interests. The burden of proving that such removal is in the children's best interests lies with the party seeking removal. 750 ILCS 5/609(a) (West 2002).

In *In re Marriage of Eckert*, 119 Ill. 2d 316 (1988), our supreme court identified specific factors that should be considered in determin-

ing if removal is in a child's best interests. *Eckert*, 119 Ill. 2d at 326-27. First, the trial court "should consider the proposed move in terms of likelihood for enhancing the general quality of life for both the custodial parent and the children." *Eckert*, 119 Ill. 2d at 326-27. Second, the court should consider "the motives of the custodial parent in seeking the move to determine whether the removal is merely a ruse intended to defeat or frustrate visitation." *Eckert*, 119 Ill. 2d at 327. Also, the court should examine the motives compelling the noncustodial parent to resist the move. *Eckert*, 119 Ill. 2d at 327. The visitation rights of the noncustodial parent should be considered, as the best interests of the child are served if he or she retains a healthy and close relationship with both parents, as well as other family members. *Eckert*, 119 Ill. 2d at 327. Finally, the court must determine if a realistic and reasonable visitation schedule can be reached if the move is allowed. *Eckert*, 119 Ill. 2d at 327. A reasonable visitation schedule should aim to preserve and foster the child's relationship with the noncustodial parent. *Eckert*, 119 Ill. 2d at 327. If the best interests of the children would not be affected by a move to another state, the custodial parent's removal request should granted. *Eckert*, 119 Ill. 2d at 327.

We reverse a trial court's determination of what is in the best interests of the child only if it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred. *Eckert*, 119 Ill. 2d at 328. Based on my review of the record, I conclude that the trial court's findings are against the manifest weight of the evidence and that a manifest injustice will be created by allowing the court's determination to stand.

The first *Eckert* factor, and most contentious here, is the likelihood that the proposed move will enhance the general quality of life for both the custodial parent and the children. With respect to this factor, the trial court found that Lisa wanted to move primarily to pursue her own happiness, in that she sought to save money by consolidating her business and hoped to start a new family with Allen. Moreover, the court failed to find "substantial evidence of enhancement in the quality of the lives of the children."

Recently, in *Collingbourne*, 204 Ill. 2d at 498, the supreme court observed that benefits a child may experience should not be characterized as "direct" or "indirect"; such distinctions may divert focus from the real issue of whether a child's life will be enhanced by the move. *Collingbourne*, 204 Ill. 2d at 525. Rather, as the court stated in *Eckert*, a trial court must " 'consider the proposed move in terms of likelihood for enhancing the general quality of life for *both* the custodial parent *and* the children.' " (Emphasis in original.) *Collingbourne*, 204 Ill. 2d

at 525, quoting *Eckert,* 119 Ill. 2d at 326-27. Indeed, removal would rarely be permitted where a child was in a good environment, with good schools, good parents, and good friends, if the court considered only the direct benefits to the child. *Collingbourne,* 204 Ill. 2d at 525. "Because the principal burden and responsibility of child rearing falls upon the custodial parent, there is a palpable nexus between the custodial parent's quality of life and the child's quality of life." *Collingbourne,* 204 Ill. 2d at 526. Thus, the best interests of the child cannot be considered without also assessing the best interests of the custodial parent. *Collingbourne,* 204 Ill. 2d at 526.

The *Collingbourne* court cautioned that not every enhancement in the quality of life of the custodial parent automatically translates into an improvement in the quality of life of the child, or that benefits derived from the move will always be sufficient to warrant removal. *Collingbourne,* 204 Ill. 2d at 528. Rather, the court wished to "emphasize that because there is a nexus between the well-being of the custodial parent and the child who is in the parent's care, all benefits afforded to the child as a result of the move must be considered by the circuit court in making its best interests determination." *Collingbourne,* 204 Ill. 2d at 528. A trial court's examination should not simply be limited to exploring enhanced economic opportunities for the custodial parent. *Collingbourne,* 204 Ill. 2d at 528-29. The court must also consider noneconomic factors that either contribute to or detract from the well-being and happiness of the custodial parent and the children. *Collingbourne,* 204 Ill. 2d at 528-29.

In this case, approving Lisa's removal request would allow her to marry Allen. From all accounts, they would create a stable and loving family for Christiana and Tony. Allen and Lisa would be able to pool their finances and share their child-rearing obligations. The creation of a new family in the social environment of a traditional family setting constitutes an important benefit to children. See *Collingbourne,* 204 Ill. 2d at 529. Given the fact that Allen and Lisa operate a business together, it appears that the move would grant them tremendous flexibility in managing their daily lives. The move to Cedarburg would allow Lisa to spend much more time with the children and avoid using a child care provider. Her new workday would be from approximately 9 a.m. to 3:15 p.m., instead of 8 a.m. to 5 p.m. Her new hours would allow her to devote additional time and attention to the children rather than to work. In addition, the number of overnight business trips Lisa must take would be greatly decreased.

The children's new school in Cedarburg, St. Francis Borgia, is at least comparable to and, in Lisa's view, better than the school they attend in Geneva. It appears that the children would have a greater op-

portunity to participate in after-school activities in Cedarburg because Lisa would be free when the children finish school.

Carl has urged that no pecuniary benefits would result from the move, because Lisa does not expect that her income would change substantially after the move. However, Carl ignores the fact that Lisa and the children's expenses would most certainly decrease as a result of the move to Cedarburg, as Lisa would share expenses with Allen. Thus, Lisa would have greater discretionary income. With the additional savings, Lisa indicated that she would contribute greater amounts to the children's future education. Where a custodial parent's financial situation improves, children will generally benefit as a result of an enhanced standard of living. See *Collingbourne*, 204 Ill. 2d at 529.

I further observe that, as a result of the move, Lisa expects that HSSM would save about $35,000 annually by consolidating offices and operating with greater efficiency. I do not believe that Lisa's desire to move should be impugned simply because she is motivated in part by business interests. Although Carl argues that Lisa is placing financial interests before the well-being of her children, the record does not support such a conclusion. Rather, Lisa has reached a perfectly rational conclusion that moving to Wisconsin would result in certain incidental business benefits. The trial court should have considered this benefit when it considered the factors identified in *Eckert*. See *Collingbourne*, 204 Ill. 2d at 525, quoting *Eckert*, 119 Ill. 2d at 326-27.

The second and third factors provided in *Eckert* require the trial court to consider the motives of the custodial parent in requesting the move and the motives of the noncustodial parent in opposing the move. *Eckert*, 119 Ill. 2d at 327. With respect to Lisa, there is no indication in the record that Lisa's desire to move to Cedarburg is "merely a ruse intended to defeat or frustrate visitation." *Eckert*, 119 Ill. 2d at 327. Lisa indicated and demonstrated that she considers Carl's involvement in the children's lives very important. Carl also acknowledged that Lisa has been "pretty good" at arranging visitation, describing her level of cooperation as a "9 or 10" on a 10-point scale.

The trial court has wrongfully chastised Lisa for being guided by selfish motives in this matter. Adjustments and accommodations must be made as a result of a divorce, the entire point of which is to permit each parent to go on his or her own way. *Collingbourne*, 204 Ill. 2d at 535. "Within reason, both parties must be permitted to do so, and the child's best interests must be served within that context." *Collingbourne*, 204 Ill. 2d at 535. On the other hand, the trial court's determination that Carl's vigor in pursuit of this matter is "predicated on his own selfish desires" does appear to hold water. That said, based

on my review, Carl also genuinely loves his children and, amongst a swirl of other motivations, does fear that the move is not in the children's best interests. However, I find that Carl's fears are not well founded given the relatively short distance Lisa wants to move.

The last *Eckert* factors address the noncustodial parent's visitation. Under *Eckert*, the trial court must carefully consider the effect the proposed move would have on the visitation rights of the noncustodial parent, because it is in a child's best interests to have a healthy and close relationship with both parents, as well as other family members. *Eckert*, 119 Ill. 2d at 327. A court must assess whether a realistic and reasonable schedule can be reached if the move is allowed to proceed. *Eckert*, 119 Ill. 2d at 327.

Here, Lisa hopes to move to Cedarburg. Cedarburg lies just north of Milwaukee. From Woodridge, the longest time Carl would possibly have to spend traveling to visit the children is about two hours. As the situation now stands, Carl must already travel an hour to visit the children, assuming that Lisa has moved to Lake Villa as she intended to do at the time of the hearing in August. Carl stated that he too intended to move to Lake Villa if the children moved there, so he could be close to them. In Lake Villa, Carl would be an hour away from the children in Cedarburg and an hour away from his job in Woodridge.

Carl has great flexibility in his work schedule, working about 100 days a year as a fireman. Specifically, Carl appears to be concerned that he would no longer be able to pick the children up after school, spend the evening with them at his house in Woodridge, and then return them to Lisa's home later in the evening. However, in all cases, removal will have some effect on visitation. *Collingbourne*, 204 Ill. 2d at 532. The essential question is whether a visitation schedule that is both reasonable and realistic can be created. *Collingbourne*, 204 Ill. 2d at 532. The visitation schedule need not be perfect. *In re Marriage of Parr*, 345 Ill. App. 3d 371, 380 (2003).

Carl still would be available to visit the children on his days off work. He would be able to participate in almost all of the children's activities. Carl acknowledged that he would be able to continue participating in just about all of the activities he currently enjoys with the children. Frankly, it does not appear that moving the children to Cedarburg would have any significant impact on the rest of Carl's visitation schedule. For example, the children still would be able to spend entire weekends at Carl's house, just as they have done in the past.

A reasonable visitation schedule is one that will preserve and foster the children's relationship with the noncustodial parent. *Eckert*,

119 Ill. 2d at 327. I am certain that, given Lisa's requested move in this case, a visitation schedule could be fashioned to preserve Carl's relationship with his children. Thus, I disagree with the trial court's conclusion that "there is no proof that there can be formulated a visitation schedule for Mr. DeLeo that can be termed 'reasonable and realistic.' " If a reasonable visitation schedule cannot be established in this case, indeed, it would be a rare occasion that a petitioner could satisfy his or her burden. In fact, when effort is expended to establish a reasonable visitation schedule, close relationships can continue and even be enhanced. *Collingbourne*, 204 Ill. 2d at 533.

It is true that removal requests must be decided on a case-by-case basis. *Eckert*, 119 Ill. 2d at 326. Nevertheless, I find it inconsistent and unfair that Lisa's removal request has been denied when the petitioner's request in *Collingbourne* was approved. Similarly situated individuals must be able to look at prior cases for guidance and anticipate that they will be afforded similar treatment. The results of the present case betray this principle.

Finally, I note that although the trial court believed that the children were "confused and unhappy about the prospects" of moving to Cedarburg, Valerie Jencks opined that both Christiana and Tony were emotionally capable of handling the move. The mixed emotions the children have expressed are natural and to be expected, but insufficient to justify denying Lisa's petition. See *Collingbourne*, 204 Ill. 2d at 534.

For the aforementioned reasons, I would reverse the trial court's denial of Lisa's request for removal and remand for the limited purpose of setting a visitation schedule.