No. 2--04--0203

______________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

In re
 MARRIAGE OF ) Appeal from the Circuit Court 

JOAN K. JOHNSON, )   of Du Page County.

n/k/a Joan K. Pokriefka,       )   

 )

Petitioner-Appellant,   )

   ) 

and ) No. 99--D--937

 ) 

JOSEPH A. PISOWICZ, ) Honorable 

 ) Brian R. McKillip,

Respondent-Appellee. ) Judge, Presiding.

______________________________________________________________________________

JUSTICE GILLERAN JOHNSON delivered the opinion of the court:

The petitioner, Joan Pokriefka, appeals from the January 4, 2004, order of the circuit court of Du Page County denying her petition to remove her children and those of the respondent, Joseph Pisowicz, to Arizona.  On appeal, Joan argues that the trial court's denial of her removal petition was against the manifest weight of the evidence.  
We affirm.  

The parties were married on October 10, 1980.  Two children were born to the marriage: Katherine, born October 4, 1989, and Erik, born August 22, 1991.  The parties' marriage was dissolved on June 7, 2000.  The judgment for dissolution and incorporated joint parenting agreement  provided the parties with joint custody of the children.  The children were to reside primarily with Joan but visit with Joseph every Wednesday and alternate Tuesdays, weekends, and holidays.  

On February 18, 2003, Joan petitioned for leave to remove the children to Arizona.  In her petition, she alleged that her husband, Michael Pokriefka, was informed that his employment with 

JDA Software would terminate unless he accepted a transfer to Arizona.  She alleged that moving the children to Arizona was necessary to maintain and support the family unit.  Thereafter, on March 11, 2003, Joseph petitioned for a modification of custody.   

The trial court conducted a hearing on Joan's and Joseph's petitions between October 30, 2003, and November 6, 2003.  Michael Pokriefka testified that he met Joan in February 2002.  They began dating in April 2002.  Michael and Joan became engaged to be married in August 2002.  Michael moved in with Joan in November 2002 and they resided in Joan's home in Lombard, Illinois. Michael and Joan married on December 14, 2002.     

Michael works for a company known as JDA Software.  At the time of the hearing, Michael had been working for JDA Software for four years.  Michael currently earns $72,000 per year as salary and typically receives quarterly bonuses of approximately $1,500.  In October 2002, Michael learned that he would be required to transfer to Arizona or accept a severance package.  While he was contemplating the transfer, Michael sent resumes to two other companies.  Michael admitted however, that he did not follow up with these applications.  Michael agreed to the transfer sometime before he and Joan married.   

Michael testified to living in nine different places over the past 30 years.  Before moving in with Joan in Lombard, he lived in Lisle, Illinois, for two years.  Prior to that, in reverse chronological order, he lived in Jackson, Michigan, for five years; Columbus, Ohio, for four years; Dearborn, Michigan, for four years; East Lansing, Michigan, for four years; Denver, Colorado, for three years; East Lansing, Michigan, for six years; Germany for two years; and St. Claire Shores, Michigan, for 18 years.       

Michael testified that he is quiet around Joan's children because that is his nature.  Michael believes that he has a good relationship with Joan's children.  Michael spends half of his time in Arizona now, but when he is in Lombard, he gets home shortly after the children get home from school.  He, Joan, and the children usually have dinner together.  Sometimes Michael takes the family out to the movies.  On occasion, he assists the children with homework.   Michael acknowledged that he tends to pay more attention to Joan than to the children. 

Michael has a 15-year-old son from a previous marriage, Joe Pokriefka, who lived with him and Joan until June 2003.   While Joe was staying with Michael and Joan, he attended an alternative educational facility.  Joe had been suspended from two other schools, Glenbard East and Naperville North, for fighting.  Joe now lives in Columbus, Ohio, with his mother. 
 However, Michael is open to the possibly of Joe moving back in with him and Joan.  Michael is looking for a five-bedroom home in Arizona.  Joe has a friendly relationship with Joan's children, although Joe tends to keep to himself.

Joan Pokriefka testified that the majority of her family ties are in Illinois.  She grew up in Illinois and has lived in Illinois her entire life, with the exception of attending college in Columbia, Missouri, for two years.  Joan's brother, his wife, and their children live in Illinois.  She also has many aunts, uncles, and cousins who live in Illinois.  Joan does have a sister who resides in Phoenix, Arizona.      

Joan met Michael in February 2002 on an Internet dating site.  They immediately began exclusively dating.  She and Michael became engaged in July or August 2002 and married in December 2002.  They did not set their wedding date until after deciding that Michael would accept the transfer.  

After Joan and Michael decided that Michael would accept the transfer, they began looking at property in the area of Scottsdale, Arizona. 
 She and Michael are looking to purchase a larger house in Arizona than the one they currently own in Lombard.  They hope to find a house with amenities such as a pool, a spa, and a fireplace.  Joan believes that Erik's asthma would improve from the dryer climate.  Joan has researched the schools in Arizona and found them to be comparable to the schools in Lombard. 

In Joan's opinion, the children would benefit by being allowed to move to Arizona with her.  If the children were allowed to move to Arizona, they would be able to remain in her care.  Joan has been the primary caretaker of the children since their birth. 
 Additionally, Joan would be able to remain a stay-at-home mom if the children were allowed to be removed to Arizona.  
Also, the children would have a traditional family setting with two parents.  The children would have both her and Michael's love and stability.   
     

Joan is an accountant.  However, she works out of her home and does not work full time.  She is always home when the children leave for school.   In 2000, Joan earned between $30,000 and $40,000.  In 2001, Joan earned $35,000.  In 2002, Joan lost some of her clients and started working less.  Since September 2002, Joan has worked on some tax returns and done some substitute teaching.   

Despite her previous testimony that she would remain a stay-at-home mom in Arizona, Joan admitted that she was actively seeking employment in Arizona.  She has browsed through employment opportunities listed on the Internet site Monster.com.  She also applied for a part-time accounting position within her husband's company.  Additionally, Joan has considered teaching full-time, although she would need to get a teaching certificate.    

Joan is very active in the children's school and extracurricular activities.  She participates in the PTA, has accompanied the children on field trips, and helps out with Katherine's Girl Scouts and Erik's Boy Scouts.   She has gone to the "Bring Your Parent to School Day" at the children's school for the past three years.  She has attended three parent-teacher conferences since June 2000.    

On the other hand, Joan described Joseph's involvement in the children's school and extracurricular activities as minimal.  According to Joan, Joseph attended only 
one parent-teacher conference since June 2000.  He has participated in only one "Bring Your Parent to School Day." Joseph has not participated in any of Katherine's Girl Scout activities or Erik's Boy Scout events.  Joseph missed Erik's bridge ceremony from Cub Scouts to Boy Scouts. 

Joan proposed a visitation schedule for the children and Joseph in the event that the trial court granted her removal petition.  Joan's proposed visitation schedule included six weeks during the summer, one week during Christmas, one week during Thanksgiving or spring break, two weekends per school year in Illinois, and one weekend per month in Arizona.  Joan acknowledged, however, that she provided Joseph with this proposed schedule only 
one week before the hearing on her petition.     

Joseph testified that the majority of his family ties are in Illinois.  Joseph grew up in Illinois. Joseph's mother and father still reside in Illinois.  Joseph's two sisters and their husbands reside in Illinois.   Joseph has several nieces and nephews who have married and started families.  They too live in Illinois.      

After his divorce from Joan, Joseph purchased a house in Lombard so that he could be close to the children.  Joseph visits with the children on Wednesdays and on alternate Tuesdays, 
weekends, and holidays.  He exercises all of his visitation.  On the weekends, his visitation with the children formally ends at 8:30 p.m. on Sunday.  However, he and Joan have agreed that, during the summer, he can keep the children until 10 p.m. on Sunday.    

Joseph has been employed by H & H Electric as a journeyman electrician for the past 28 years.  Joseph typically leaves for work about 6 a.m. and gets home about 4:30 p.m.  He is usually not required to work overtime.  

According to Joseph, he is very involved with the children's school and extracurricular activities.  When Erik was in Cub Scouts, Joseph was the den leader.  Katherine participated in chorus and Joseph went to all of her recitals.  Erik participated in soccer and Joseph attended most of his soccer games.  He helps the children with homework and reads all of their report cards.  He rewards the children when they make the honor roll.

Joseph testified that he loves his children very much.  His children are the focus of his life.  He feels that he and the children are close and that they are always there for each other.  Joseph telephones the children just about every day when they are not visiting with him.  If the children were allowed to move to Arizona, he would be devastated.  

Joseph believes that it would be equally difficult for the children if they were forced to move to Arizona.  The children would miss the time that they are currently able to spend with him, his new wife, and their extended family.  The children would miss their friends, their school, and all of the activities in which they participate.    

Diane Pisowicz, Joseph's wife, testified that she and Joseph married in April 2002.  She and Joseph have discussed having Joseph's children live with them.  They began talking about the possibility shortly before they married.  Diane is very much in favor of the children living with her and Joseph.  In fact, if Joseph is awarded primary custody of the children, she plans on rearranging her work schedule so that she is home when the children leave for school.  

When the children visit with Joseph, Diane always interacts with them.  During the week, she  helps the children with homework.  Afterwards, she prepares dinner for the family.  Katherine usually helps her with dinner.   Diane, Joseph, and the children often take walks together.  They like to walk to the Dairy Queen.  They also frequently go out to dinner and a show.  Diane, Joseph, and the children attend church together.   

Diane has a large family that includes nine brothers and sisters.  The children have 15 cousins on Diane's side of the family, whom the children have gotten to know through birthday parties, pool parties, and barbecues.  The children enjoy getting together with Diane's family.  

The trial court conducted an 
in
 
camera
 interview of Erik and Katherine.  Erik and Katherine both testified that they did not want to live in Arizona.  They would miss their school, friends, and family. Erik testified that he liked the weather in Arizona but that he would hate living there.  Katherine described the prospect of living in Arizona as "different, unknown, and a little scary."

Dr. Robert Shapiro, a court-appointed psychologist for the children, testified that he met with Joan, Joseph, and the children on several occasions.  He met with Joan individually on four occasions, with Joseph individually on three occasions, and with the children on four occasions.  He administered the Minnesota Multiphasic Personality Inventory Test to Joan and Joseph
.  He administered the Incomplete Sentences Blank Test to Erik and Katherine
.  Based on the meetings and the test results, Dr. Shapiro prepared an eight-page report recommending that the children continue to reside with Joan and that they be allowed to be removed to Arizona.        

Dr. Shapiro testified that the children have thrived being in the primary custody of Joan.  He explained that the children are pleasant, receive good grades in school, participate in extracurricular activities, and have a myriad of friends.  Dr. Shapiro testified that Joan is supportive of the children spending a lot of time with their father.  She offered Joseph an extended visitation schedule over the summer and holidays, in the event that her removal petition was allowed.  

Dr. Shapiro testified that the move appeared to be necessary for Joan from an economic standpoint.  If the removal petition were denied, Joan would probably have to go back to work.  Michael would need to terminate his employment with JDA Software and search for work in the Chicagoland area, or Michael and Joan would have to live apart and maintain two households.  Either way, Joan's income would be needed.  

Dr. Shapiro believed that the children's good relationship with Joseph could be maintained long distance.  Because the children were 14 and 12, they had already formed a strong bond with their father.  The children were old enough to travel by plane alone and could take advantage of the extended visitation schedule proposed by Joan, which included the majority of the summer break and alternating  holiday breaks.  The children could also use e-mail and the telephone to keep in contact with Joseph.  Dr. Shapiro testified that there would be a period of adjustment for the children.  He noted that the children were concerned about leaving their friends behind.  However, he felt that both Erik and Katherine would make new friends fairly quickly.  The biggest detriment to the children would  be that they would not be able to see their father as frequently.  Their time with Joseph would be spent differently and in large chunks.  Dr. Shapiro admitted that the visitation the children currently
 have with their father is more ideal because Joseph is able to participate in the children's school and extracurricular activities.    

Following the hearing, the trial court denied Joan 's petition for removal and denied Joseph's petition for a modification of custody.  In making its removal determination, the trial court considered, among other factors, whether allowing removal would enhance the general quality of life for Joan and the children.  The trial court found that removal would undoubtedly enhance Joan's quality of life.  As to the children's quality of life, however, the trial court found that removal would provide little enhancement.  The trial court noted that an enhancement of Joan's life would benefit the children's lives.  However, it found that the children would be giving up more than they would gain.  The children would miss their family and lose their friends and school relationships.  The trial court particularly noted the importance of Joseph's presence in the children's life:

"The testimony of Mr. Pisowicz and his current wife, Diane, and the 
in
 
camera
 interview with Kate & Erik describe a 'visitation' experience that seems more valuable to the children than that [
sic
] existent in most cases.  It is not only the time with their father and Diane, but the warm and nurturing nature of that time which is difficult to articulate but certainly present.  Moreover, there is the additional benefit of the extended family that the children have here in Illinois.  Mr. Pisowicz's marriage to Diane has provided the children with an even greater family circle that they seem to deeply enjoy.  While Ms. Pokriefka has a sister living in Phoenix, Joseph and Diane Pisowicz provide the children with a true community of family in Northeastern Illinois. The value of that experience would be lost on relocation."       

Thereafter, Joan filed a timely notice of appeal from the denial of her removal petition.    

Joan's primary argument on appeal is that the trial court's decision to deny her petition for removal was against the manifest weight of the evidence.  Section 609 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/609 (West 2002)) governs requests for removal.  That section provides:

"The court may grant leave *** to any party having custody of any minor child or children to remove such child or children from Illinois whenever such approval is in the best interests of such child or children.  The burden of proving that such removal is in the best interests of such child or children is on the party seeking removal."  750 ILCS 5/609(a) (West 2002).  

As explained by our supreme court in 
People v. Eckert
, 119 Ill. 2d 316, 325 (1988), the paramount question in a removal action is whether the move is in the best interests of the child.  A determination of a child's best interests can often be difficult for a trial court to make.  
Such a determination cannot be reduced to a simple bright-line test but, rather, must be made on a case-by-case basis, depending upon the circumstances of each case.  
Eckert
, 119 Ill. 2d at 326
.  
A trial court's determination of what is in a child's best interests should not be reversed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred.  
Eckert
, 119 Ill. 2d at 328
.  
  

A trial court should hear any and all relevant evidence before making its determination, keeping in mind five salient factors
.  
Eckert
, 119 Ill. 2d at 326
.  
Those factors are (1) whether the proposed move will enhance the quality of life for both the custodial parent and the child; (2) the custodial parent's motives in seeking the removal and whether the proposed move is merely a ruse intended to defeat or frustrate visitation; (3) the noncustodial parent's motives in resisting the removal; (4) the proposed move's likely effect on the noncustodial parent's visitation rights; and (5)  whether a realistic and reasonable visitation schedule for the noncustodial parent can be worked out. 
Eckert
, 119 Ill. 2d at 
326-27.  However
, these factors are not exclusive.  
In re Marriage of Collingbourne
, 204 Ill. 2d 498, 523 (2003); 
In re Marriage of Smith
, 172 Ill. 2d 312, 321 (1996).  Moreover, no individual factor is controlling and the weight accorded each factor will vary according to the facts of each case.  
Collingbourne
, 204 Ill. 2d at 523;  
Smith
, 172 Ill. 2d at 321.

 
Applying the above principles to the present case, we cannot say that the trial court's denial of Joan's petition for removal was against the manifest weight of the evidence.  The trial court found that the first 
Eckert
 factor weighed slightly
 against removal.  We agree.  Joan's life would be enhanced if she and the children were allowed to move to Arizona.   The move would allow Joan to remain married and her family to stay together.  The move would be financially beneficial to Joan.  It would allow her to continue working part time.  These benefits to Joan would,  in turn, also benefit the children.  
However, by moving to Arizona, the children would be reluctantly leaving much behind, most notably their father and their father's new wife, Diane.  They also
 would be leaving behind their father's, Diane's, and their mother's extended families, most of whom reside in Illinois.  Moreover, the children would miss their school, friends, and activities.       

The second 
Eckert
 factor also weighs in favor of removal.  The proposed move is certainly not a ruse to frustrate Joseph's visitation rights.  In fact, the move appears to be financially important to Joan, as her husband's employer was requiring him to accept either
 a transfer or a severance package.  However, we do note, as did the trial court, the peculiar timing 
of the transfer and Joan's and Michael's marriage.    

The third and fourth 
Eckert
 factors weigh strongly
 against removal.  As to the third factor, Joseph's motives in resisting the removal are pure.  He loves his children.  They are the focus of his life.  The record reveals that Joseph is a very involved parent.  He attends Erik's soccer games and Katherine's chorus recitals.  He has gone to parent-teacher conferences and participated in a "Bring Your Parent to School Day."  He exercises most, if not all, of his visitation rights.  When the children visit, they all take walks, go out to dinner, and see movies together.  Joseph even telephones the children on the days they do not visit.  The trial court specifically noted how strong the bond is between Joseph and his children. 

As to the fourth factor, removing the children to Arizona would drastically affect Joseph's visitation with the children.  The children currently visit with Joseph every Wednesday and on alternating Tuesdays, weekends, and holidays.  
The trial court found that these visits were nurturing and invaluable to the children.  The current visitation schedule obviously will not be feasible if the children are allowed to move to Arizona.  A removal to Arizona would instead require Joseph and the children to visit very differently, much less frequently, and in bigger blocks of time.      

The fifth 
Eckert
 factor weighs neither in favor nor against removal.  Joan did propose a very fair visitation schedule for Joseph in the event removal was allowed.  This schedule included the majority of the summer, several weekends during the school year, and alternating holiday breaks.  However, the record also reveals that Joan proposed this schedule only days before the hearing, calling into question the sincerity of the proposed visitation schedule.    

After carefully considering all of the above factors
, the trial court denied Joan's request to remove the children to Arizona
.  Under the circumstances, with the majority of the factors weighing against removal, we cannot find that the trial court's determination was against the manifest weight of the evidence.

 Joan maintains that the trial court's decision was in contravention of the supreme court's decision in 
Collingbourne
.  In particular, Joan argues that the trial court failed to consider the indirect benefits as well as the direct benefits that a move to Arizona would provide for the children.  We disagree.

In 
Collingbourne
, the supreme court reiterated its previous holding in 
Eckert
, that a trial court must consider a proposed move in terms of the likelihood of enhancing the quality of life of both the parent and the child.  The 
Collingbourne
 court explained:

"Indeed, '[i]f only the direct benefits *** were considered, rarely would a situation arise where removal would be permitted where children were in a good environment with good schools, good parents, and good friends.' "  
Collingbourne
, 204 Ill. 2d at 525
, quoting 
In re Marriage of Ludwinski
, 312 Ill. App. 3d 495, 499 (2000).    

The 
Collingbourne
 court further explained:

"It follows that what is in the best interests of the child cannot be considered without assessing the best interests of other family members of the household in which the child resides, most particularly the custodial parent."  
Collingbourne
, 204 Ill. 2d at 526.

Because there is a nexus between the quality of life of the custodial parent and that of the child, a trial court must consider both the indirect and the direct benefits that a proposed move has to offer.  
Collingbourne
, 204 Ill. 2d at 528
.

Contrary to Joan's argument, the record here reflects that the trial court conscientiously  followed 
Collingbourne
.  In its written opinion, the trial court acknowledged the 
Collingbourne 
decision and that the children would experience indirect benefits from a move to Arizona as a result of their mother's enhanced quality of life.  However, the trial court found no benefits to the children beyond those indirect benefits.  Instead, the trial court noted all that the children would be forgoing, by way of family, friends, and school.  The trial court especially noted the powerful relationship between the children and their father, which would be adversely affected by the move.     

We are mindful that our decision may, at first glance, seem at odds with this court's recent decision in 
In re Marriage of Repond
, 349 Ill. App. 3d 910 (2004).  In 
Repond
, this court applied the 
Eckert
 factors and reversed a trial court's ruling denying the custodial parent's petition to remove the children to Switzerland.  
Repond
, 349 Ill. App. 3d at 917. 
 The 
Repond
 court then went on to state its disagreement with another recent decision of this court in 
In re Marriage of Stahl
, 348 Ill. App. 3d 602 (2004), which affirmed a trial court's denial of a custodial parent's petition for removal to Wisconsin.  
Repond
, 
349 Ill. App. 3d at 920-21.

This court stands by the 
Stahl
 case as being sound in reason and consistent with our supreme court's pronouncements in 
Eckert
 and 
Collingbourne
.  There are several other important aspects to 
Collingbourne
 that must be 
emphasized, besides the nexus between the well-being of the custodial parent and the well-being of the child.  
Indeed, after explaining the connection between the well-being of the custodial parent and that of the child, the 
Collingbourne
 court went on to further explain:

"Our decision today, however, should not be interpreted as standing for the proposition that any enhancement in the quality of life of the custodial parent automatically translates into an improvement in the quality of life for the child, or that such benefits will always be sufficient to warrant removal. However, we emphasize that because there is a nexus between the well-being of the custodial parent and the child who is in this parent's care, all benefits afforded to the child as a result of the move must be considered by the circuit court in making its best interests determination.  We caution, however, that in making this determination, a circuit court should not limit its examination solely to enhanced economic opportunities for the custodial parent.  A court must also consider other noneconomic factors resulting from the move which are likely to contribute to, or detract from, the well-being and happiness of the custodial parent and the child."  
Collingbourne
, 204 Ill. 2d at 528.

We reiterate that a child's best interests cannot be determined on the basis of any bright-line rule.  
Eckert
, 119 Ill. 2d at 326
;
 
Smith
, 172 Ill. 2d at 321.
  Rather, a child's best interests largely depend upon the circumstances present in the case.  
Eckert
, 119 Ill. 2d at 326
;
  
Smith
, 172 Ill. 2d at 321.
  Furthermore, the weight accorded to each 
Eckert
 factor will vary according to the facts of each particular case.  
Smith
, 172 Ill. 2d at 321.
 
 A careful reading of both 
Repond
 and 
Stahl
 will reveal that the facts and circumstances surrounding 
Repond
 were vastly different from those surrounding 
Stahl
.  Indeed, rarely will the facts and circumstances in two separate removal cases be comparable.  Reviewing courts and trial courts alike should take care to review the particular facts of each removal case, as one case is likely distinguishable from the next.   

     The case at hand is certainly distinguishable from 
Repond
.  In 
Repond
, the noncustodial parent was not involved in his children's lives.  
Repond
, 349 Ill. App. 3d at 919. 
 He had exercised only
 half of his allowed visitation with the children.  
Repond
, 349 Ill. App. 3d at 919.  
He did not attend the children's extracurricular activities.  
Repond
, 
349 Ill. App. 3d at 919.  
He did not allow the children to bring friends over.  
Repond
,
  
349 Ill. App. 3d at 919. 
 
Moreover, he even refused to allow one of the children to live with him. 
 
Repond
,
 
349 Ill. App. 3d at 920. 
 
However, in the present case, Joseph is a loving, involved parent whose life revolves around his children.  
He is a parent who possesses a unique and strong bond with his children; a bond that, if broken, could be detrimental to the children. 
      

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed. 

   Affirmed.  

GROMETER and KAPALA, JJ., concur.