*In re* MARRIAGE OF DIANE GRATZ, n/k/a Diane Kent, Petitioner-Appellant, and GEORGE GRATZ, Respondent-Appellee.

Second District   No. 2—88—1270

Opinion filed November 29, 1989.—Rehearing denied February 8, 1990.

R. Peter Carey and Uve R. Jerzy, both of Mandel, Lipton & Stevenson, Ltd., of Chicago (Richard A. Lifshitz, of counsel), for appellant.

Charles Locker, of Chicago, for appellee.

JUSTICE DUNN delivered the opinion of the court:

Diane Gratz Kent appeals from an order of the circuit court of Lake County denying her petition to remove her minor son, Gary, from Illinois to Arizona and granting the petition of her former husband, George Gratz, for modification of custody. Diane argues on appeal that the denial of her petition to remove was against the manifest weight of the evidence, that the trial court relied upon improper factors in denying the petition, and that the trial court erred by granting George's petition to modify custody solely because of Diane's move to Arizona. We reverse and remand.

The marriage of Diane and George was dissolved by court order on June 4, 1981. Their son Gary was almost two years old at the time. The parties agreed that Diane would receive custody of Gary and George would be granted reasonable visitation. Diane married her current husband, David Kent, on March 20, 1983. George married his current wife, Lori, about two years and nine months prior to the hearing on Diane's petition to remove and his petition for modification of custody, which was held from September 29 to October 6, 1988.

David Kent retired from his position as a mechanical engineer with Abbott Laboratories on July 31, 1988. At the time, David, Diane, and Gary lived in a house in Glenview. George and Lori lived in a house in Waukegan. Gary generally spent most of the week in the Kent household. George would usually pick Gary up from the Kents on Saturday evening at about 6 p.m. Gary would then stay with the Gratzes until Monday morning, when George would drive him to the parochial school he attended in Glenview. Most of Gary's close friends resided near the Gratzes in Waukegan. He did not have many friends at school or in the Kents' neighborhood in Glenview. Gary would also spend one to two weeks per year with the Gratzes during the summer.

At the time of David's retirement he owned 13 houses in Arizona. David had long desired to move to Arizona after retirement. Diane and David purchased a house in Glendale, Arizona, in the early part of August 1988. They took Gary out to Arizona for a vacation that month and enrolled him in a public school near the new home. On August 17, 1988, Diane filed her petition for leave to remove Gary to Arizona. On August 23, George filed a response opposing Diane's petition and filed his petition to modify custody. During the pendency of the proceedings on these petitions, Diane and Gary temporarily resided in a motel located at the intersection of Routes 21 and 45 in Lake County.

Diane alleged at trial and alleges on appeal that the move would be in Gary's best interests for the following reasons: (1) Gary's health would be improved because he is allergic to ragweed and there is much less ragweed in Arizona; (2) David's health would be improved because he suffers from sleep apnea syndrome, a condition which causes him to snore loudly, and the condition improved during his August 1988 trip to Arizona; and (3) Diane would not have to work full time in Arizona because of the reduced cost of living and reduced expenses necessary to manage David's real estate holdings, thus enabling her to spend more time with Gary. In arguing against removal, George has relied primarily upon Gary's expressed preference to live with him in Waukegan and the potential disruption that the move would cause in Gary's relationship with his friends in Illinois and with George.

Dr. Lawrence Elegant, a specialist in treating allergies, testified about Gary's allergies. Dr. Elegant first examined Gary on September 15, 1988, two weeks prior to the hearing on the parties' petitions. Gary had an itchy, badly running nose with itching and tearing in his eyes. Dr. Elegant noticed that Gary's throat was severely irritated as well and that there was fluid behind his left eardrum. According to Dr. Elegant, Gary had an allergic rhinitis. Gary also displayed some evidence of atrophic rhinitis, which means that certain areas of the mucous membranes had become flattened, affecting his ability to smell and taste.

Dr. Elegant conducted tests with regard to the cause of the allergies. His preliminary finding was that Gary had a marked ragweed hay fever. Dr. Elegant testified that the Great Lakes area has the highest degree of ragweed pollen production during the ragweed season in the United States. He further stated that the Phoenix area has much less ragweed than the Chicago area.

Dr. Elegant prescribed nasalcrom and an antihistimine for Gary.

Nasalcrom is inhaled and contains a chemical called cromolyn sodium. The next time Dr. Elegant saw Gary, which was on September 23, he showed some improvement with regard to his nasal activity, and there was marked improvement with the fluid problem in his left eardrum. According to Dr. Elegant, Gary's condition would likely show a marked improvement as a result of a move from the Chicago area to the Phoenix area. He also testified that the ragweed pollen count in 1988 was very high.

The evidence deposition of Dr. Daniel Wynn, a specialist in neurology who had a subspecialty in sleep disorders, was admitted at trial. Dr. Wynn saw Diane Kent on May 7, 1988, because Diane had trouble sleeping at night and would sometimes fall asleep at work in the early afternoon. One of the causes of her trouble was David's loud snoring. David first saw Dr. Wynn on June 7, 1988. He performed a daytime sleep study on David 10 days later, which consisted of observing and monitoring David while he slept. Dr. Wynn concluded that David had obstructive sleep apnea syndrome. After David fell asleep, he would continually partially block his airway and cut off the air to his lungs, causing him to repeatedly awaken. David snored very loudly as a result. Diane testified that he snored so loudly she could not sleep in the same room.

Dr. Wynn believed that David's condition was caused by allergies, the fact that he had previously suffered a broken nose, and by other factors. Dr. Wynn testified there was a surgical procedure that was effective for between 50% and 60% of the patients. David Kent did not wish to have this operation, however. Dr. Wynn prescribed a nasal spray for David, but it was not effective. Another possible course of treatment was to have David wear a mask called a C-PAP every night. The mask blows air into a patient's lungs to keep the airway open and will often stop snoring and other problems associated with sleep apnea syndrome.

According to Dr. Wynn, a move to a drier climate would likely cause an improvement in David's condition. Dr. Wynn saw David on September 23, 1988, after David had spent several weeks in Arizona. David reported that he was snoring much less and was less dependent upon nasal sprays and other medication to keep his nasal passages open. Dr. Wynn felt the reduction in snoring was very significant, but he was not yet able to determine whether the move would eliminate the need for further treatment of David's condition.

David and Diane both testified that David's snoring was greatly reduced when they went to Arizona in August 1988, and Diane was able to sleep with him in the same room. The Kents also testified that

Gary's allergies improved significantly during this time. Diane testified that Gary had shown allergy symptoms in 1987; George stated that he did not notice any such symptoms that year.

Diane and David also testified that because certain savings would result from the move, Diane would either not have to work at all or only have to work part time, enabling her to spend more time with Gary. The savings would result because David would no longer have to pay for air travel from Illinois to Arizona to check on his real estate holdings, and he would be able to take over most of the maintenance work for the properties.

The trial judge held a conference with Gary in chambers with only the parties' attorneys present. During this conference, Gary informed the trial judge that he did not wish to move to Arizona and would prefer to live with his father in Waukegan. Gary also told the trial judge that most of his friends lived in Waukegan near his father.

Dr. Daniel Rybicki, a psychologist, was the court-appointed conciliator in the present case. Dr. Rybicki interviewed Gary and both of the parties several times and also spoke to the parties' spouses. Gary expressed his preference to live in Waukegan with his father to Dr. Rybicki. In his report and his testimony, Dr. Rybicki concluded that it would be in Gary's best interests to live in Waukegan with his father.

According to Dr. Rybicki, both the Kent and Gratz households were good places for a child to live. The Kents had done a very good job of raising Gary. In general, the Kent household was more structured than the Gratz household. Dr. Rybicki believed it would be advantageous for Gary to be in a more flexible setting with the Gratzes because as he became older, he would need more independence in order to grow from a personal standpoint. Dr. Rybicki also felt it was important to respect Gary's wishes in this regard because ignoring them might cause Gary to feel more insecure. He also stressed the importance of Gary's relationship with his friends in Waukegan, although he testified that Gary could probably make new friends in Arizona. According to Dr. Rybicki, Gary stated that it was time for him to spend more time with his father.

During their testimony, the Kents stated they would be willing to permit Gary to stay with his father during most of his summer vacation and to visit his father one weekend per month all other months. The Kents were willing and able to pay Gary's air fare for all visits. George testified, however, that he did not find this agreeable because his contact with Gary would not be as regular. George stated that the reason he opposed the removal petition was that he wanted Gary to have what Gary desired.

The trial court denied the petition to remove and granted the petition to modify custody. In so doing, the trial court relied primarily upon Dr. Rybicki's report and testimony. The trial judge stated that the petition to modify would not have been granted were it not for the move and conditioned the granting of the petition on the Kents' adherence to the move. The court denied Diane's motion to reconsider, and the instant appeal ensued.

Under section 609 of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1987, ch. 40, par. 609), the burden is on the petitioner to show that removal of a child from Illinois is in the child's best interests. (*In re Marriage of Eckert* (1988), 119 Ill. 2d 316, 325.) While a determination of the best interests of the child must be made on a case-by-case basis and will depend to a great extent upon the circumstances of the case, the following factors should be considered by the trial court in removal cases: (1) the likelihood the proposed move will enhance the general quality of life for the child and the parent having physical custody; (2) the motives of the parent having physical custody in seeking to move; (3) the motives of the other parent in resisting removal; (4) the visitation rights of the parent lacking physical custody; and (5) whether a reasonable and realistic visitation schedule is possible if the move is approved. (*Eckert,* 119 Ill. 2d at 326-27; *In re Marriage of Kutinac* (1989), 182 Ill. App. 3d 377, 382.) The trial court's determination of what is in the child's best interests in the context of a removal petition should not be reversed unless it is clearly against the manifest weight of the evidence and it appears a manifest injustice has taken place. *Eckert,* 119 Ill. 2d at 328.

With regard to the *Eckert* factors, we first note that there is no evidence in the record that Diane's motives in seeking to move were improper, which means there is no evidence the move was a ruse to frustrate George's visitation rights. (119 Ill. 2d at 327.) Nor is there any evidence that George's motives in resisting removal were improper; he appears to have been motivated by a genuine concern for Gary. As a result, we need only consider the other three factors. See *In re Marriage of Zamarripa-Gesundheit* (1988), 175 Ill. App. 3d 184, 188.

Diane presented abundant evidence that the proposed move to Arizona would enhance the general quality of life for her and Gary. Dr. Elegant, a specialist in treating allergies, testified that the move would likely cause a marked improvement in Gary's allergies because much less ragweed is present in the Phoenix area. Although the Gratzes attempted to minimize the seriousness of Gary's condition,

Gary himself stated during his conference with the trial judge that his allergies had recently been bad.

Additionally, the evidence showed that the move was likely to benefit David's health by ameliorating his problem with sleep apnea syndrome and lessening a source of tension in David and Diane's marriage. According to Diane's testimony, David's snoring was not a problem in Arizona, and she was able to sleep with him in the same room once again.

There is also undisputed evidence that the Kents would save a substantial amount of money from moving because David could take over most of the maintenance work on his real estate holdings and would no longer have to bear the expense of flying to Arizona to check on these properties. Furthermore, the Kents had a much lower monthly mortgage payment for their Arizona home. As a result of the Kents' reduced expenses, Diane could either work part time or possibly stop working altogether and would have more time to spend with Gary.

The visitation factors must now be examined. There is no doubt that George assiduously exercised his visitation rights since Gary stayed with him in Waukegan almost every weekend. As a practical matter, weekly visitation would be impossible if Gary moved to Arizona. The Kents, however, proposed a liberal visitation schedule which would enable Gary to see his father and friends in Waukegan once a month and to spend most of his summer in Waukegan. Under this schedule, the number of days which Gary spent with George per year would remain approximately the same. The Kents also proposed to pay Gary's air fare for each of the visits.

■ The above visitation schedule appears quite reasonable, and, in light of the Kents' financial resources, it is certainly realistic. "A reasonable visitation schedule is one that will preserve and foster the child's relationship with the noncustodial parent." (*Eckert,* 119 Ill. 2d at 327.) George objects to the proposed schedule because he could not see Gary every week. With regard to the visitation factor, this case is quite similar to *In re Marriage of Zamarripa-Gesundheit* (1988), 175 Ill. App. 3d 184. In both cases, the noncustodial parent exercised visitation rights on a weekly basis. Although liberal visitation was proposed by the custodial parent at her expense, the noncustodial parent objected because of his preference for regular contact with the child instead of exclusive contact over longer periods of time.

The court gave little weight to the noncustodial parent's objection in *Zamarripa-Gesundheit,* stating that it believed the liberal visitation proposed by petitioner would provide the noncustodial parent with an

adequate means to foster his relationship with the child. (175 Ill. App. 3d at 190.) We believe the same to be true in the case at bar. The proposed schedule ensures that George will see Gary at least once a month and will be with him most of the summer. The amount of time George spends with Gary over the course of one year remains about the same. This schedule is more than adequate to preserve and foster George's relationship with Gary.

Gary's relationship with his friends in Waukegan is another factor to be considered. We believe the visitation schedule will allow him to maintain his relationship with these friends. It is noteworthy that the schedule would enable Gary to see these friends on a daily basis during most of their summer vacation instead of only on weekends during the summer. Since children of that age generally have more free time during the summer when school is not in session, the proposed visitation schedule could allow Gary to spend even more time with his Waukegan friends than he did while living in Glenview.

We realize that Gary expressed a desire to remain in Illinois because of the presence of his father and friends in Waukegan. In the context of the removal petition, however, little, if any, weight should have been given to Gary's desires because the proposed visitation schedule ensured that Gary would have about the same amount of contact with his father and friends in Waukegan.

Gary also expressed a preference to live with his father instead of his mother. In ruling on the removal petition, the court relied largely on this expressed preference and made specific reference to Gary's statement that it was time for him to spend more time with his father. The court also considered other evidence that George would be a better custodial parent for Gary, including Dr. Rybicki's conclusion that Gary would be better off in the Gratz household because it was a more flexible household. The trial judge also made explicit reference to Dr. Rybicki's belief that Waukegan was a better setting for Gary because he was well adjusted there and had friends there.

■ It was manifestly erroneous for the trial judge to consider the above factors with regard to the petition for removal. The evidence that Gary would be better off living with his father in Waukegan was clearly relevant with regard to George's petition to modify custody. The Act, however, clearly distinguishes between petitions for removal and petitions to modify custody (see Ill. Rev. Stat. 1987, ch. 40, pars. 609, 610; *In re Marriage of Bednar* (1986), 146 Ill. App. 3d 704, 709), and a removal petition is not a custody matter. (*In re Custody of Mueller* (1979), 76 Ill. App. 3d 860, 862.) Evidence that George was a more suitable custodian for Gary and that Waukegan was a better

place for Gary to live than Arizona was irrelevant with regard to the removal petition. The trial court erred by considering and relying upon such evidence in ruling on the removal petition.

■ The trial court should have focused instead on whether Gary's best interests would be served by living with his mother, the custodial parent, in Illinois or moving with her to Arizona. Examining this question in light of the *Eckert* factors, as we have, the evidence clearly establishes that Gary's best interests would be served by allowing the removal petition. The evidence shows that the move would likely directly benefit Gary by significantly improving his allergies and enabling him to spend more time with his mother. Gary would also indirectly benefit from the likely improvement in David's health and resultant reduction in marital tensions. Gary would additionally be able to spend more time with his mother since she would not have to work full time. Since these benefits could be achieved while still allowing Gary ample opportunity to visit his friends and father in Waukegan, the removal petition should have been granted. The trial court's denial of the petition was clearly against the manifest weight of the evidence and must be reversed.

■ The trial judge stated that George's petition to modify custody would have been denied were it not for Diane's planned move to Arizona. Since we have concluded that the trial court should have permitted Diane to take Gary to Arizona with her, the trial court's basis for modifying custody no longer exists, and we reverse the granting of George's petition to modify custody. The trial court correctly concluded that no other basis for modification of custody exists as the evidence shows the Kents had done a good job raising Gary.

For the reasons stated herein, the order of the circuit court of Lake County denying Diane's removal petition and granting George's petition to modify custody is reversed. The cause is remanded to the trial court with directions to the trial court to enter an order granting the removal petition and to award visitation rights to George in substantial conformance with the schedule proposed by Diane.

Reversed and remanded with directions.

UNVERZAGT, P.J., and WOODWARD, J., concur.