2020 IL App (1st) 191446-U

No. 1-19-1446

Order filed May 14, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | |
|---|---|
| *In re* MARRIAGE OF | ) Appeal from the |
| | ) Circuit Court of |
| BELINDA LAVINIA MACIAS, | ) Cook County |
| | ) |
|    Petitioner-Appellant, | ) |
| | ) No. 12 D 5413 |
| and | ) |
| | ) |
| EDWARD ALEXANDER MACIAS, | ) Honorable |
| | ) Myron F. Mackoff, |
|    Respondent-Appellee. | ) Judge presiding. |

_____

JUSTICE BURKE delivered the judgment of the court.
Justices Lampkin and Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the trial court's award of monthly parenting time to the father in Texas from June through December, reverse the court's award of parenting time to the father on the weekend closest to his birthday and over Thanksgiving break and winter break, but remand the matter so that the court can create a more reasonable schedule over Thanksgiving break and winter break. We also reverse the portions of the relocation judgment that mandated visitation in Texas for the children's half-sister. Finally, we reduce the mother's requirement to contribute $15,000 toward

the father's transportation costs for exercising his parenting time by $3000, and affirm the relocation judgment in all other respects.

¶ 2 More than six years after Belinda Lavinia Macias and Edward Alexander Macias divorced, Belinda sought to relocate from Chicago to Pearland, Texas, with their two minor children. Following a relocation hearing, the trial court allowed Belinda to relocate and entered a modified parenting time schedule for the parties that included monthly visits to Texas by Edward and his daughter, J.M., from a second marriage, visits by the children to Chicago over the weekend closest to Edward's birthday, and over the children's Thanksgiving break and winter break. As part of the judgment, the court also required Belinda to contribute up to $15,000 in the costs associated with Edward exercising his parenting time, including the cost to bring J.M. with him on his visitation to Texas.

¶ 3 Belinda now appeals the relocation judgment, but only the modified parenting time provisions. She contends that the trial court: (1) awarded excessive parenting time to Edward; (2) exceeded its authority in granting visitation for J.M. in Texas and requiring Belinda to bear the associated transportation costs; and (3) erred in requiring her to contribute up to $15,000 per year for the associated travel costs of Edward exercising his parenting time, including the cost to bring J.M. with him to Texas. For the reasons that follow, we affirm in part, reverse in part and remand the matter.

¶ 4 I. BACKGROUND

¶ 5 A. Pre-Relocation Hearing

¶ 6 In June 2012, Belinda filed a petition for dissolution of marriage from Edward. They had two children together, E.M., who was nearly three years old, and N.M., who was less than a year old. Later that month, the trial court entered a judgment for dissolution of marriage that

incorporated the parties' marital settlement agreement and their joint parenting agreement, which settled all matters of custody, support and parenting time. As part of the marital settlement agreement, Edward agreed to pay Belinda $400 per month in child support—or 21 percent of his income—until he obtained his bachelor's degree, at which point the child support amount would be recalculated to be 28% of his income.

¶ 7     As part of their joint parenting agreement, both Edward and Belinda agreed to have joint custody of their children, though they agreed that the children's physical residence would be with Belinda. They agreed that Edward should have liberal parenting time with their children, and no less than two hours on Friday afternoons and one weekend morning per month for three hours. The joint parenting agreement also provided for parenting time on holidays and other occasions, including that they would alternate the Thanksgiving holiday, and Edward would have the children on Christmas Eve while Belinda would have them on Christmas Day. Additionally, Edward would have the children on Father's Day and his birthday while Belinda would have them on Mother's Day and her birthday. During the summer, both Belinda and Edward were entitled to a two-week vacation with the children.

¶ 8     In November 2018, Belinda filed a notice of intent to relocate to Pearland, Texas, a city in the Houston area, with E.M. and N.M., now nine and seven years old, respectively. Belinda asserted that she was employed as an executive corporate counsel with General Electric in its transportation division, which was in the process of being merged into another company, Wabtec Corporation. As a result, Belinda's continued employment with Wabtec was uncertain, and she sought to relocate to Pearland in order to find a new job in the Houston area. Belinda stated that she had family near Houston, and her children had spent substantial time in the area during their

childhood. Although she and her second husband, whom she married in May 2018, had not secured a residence in Pearland yet, they were currently searching for one in the area.

¶ 9    Edward objected to the relocation, so Belinda filed a petition for leave to relocate with the children, as required by section 609.2(f) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/609.2(f) (West 2018)), and explained why she believed relocation was in her children's best interests. Edward did not file a response to Belinda's petition. In January 2019, Belinda obtained leave from the trial court to file an amended petition to relocate her children. Edward did not file a response to Belinda's amended petition. That month, the court also entered an order appointing E.M. and N.M. a guardian *ad litem*, who subsequently prepared a report on the relocation issue.

¶ 10    In the report, the guardian *ad litem* noted that he had met with Belinda, Edward and their children multiple times and reviewed other evidence provided by Belinda and Edward. In discussing the factors related to whether relocation should be granted, the guardian *ad litem* acknowledged that, if the trial court granted relocation, Edward's parenting time schedule would have to be significantly modified. But the guardian *ad litem* found that it was "possible for the court to fashion a reasonable parenting time schedule that would provide Edward with the same amount of, if not more, parenting time with the children as he currently exercises." The guardian *ad litem* ultimately recommended that Belinda be allowed to relocate to Pearland but that she be required to pay for Edward to travel to the Houston area (airfare and hotel accommodations) one weekend per month to exercise his parenting time.

¶ 11    Additionally, the guardian *ad litem* recommended that Belinda be required to arrange and pay for the children to travel to Chicago on Memorial Day weekend, Labor Day weekend, Father's Day weekend, Columbus Day weekend, President's Day weekend, three weeks during the summer

but no more than two consecutively, part of Thanksgiving break, part of winter break and part of spring break. Concerning Thanksgiving break, the guardian *ad litem* recommended that the children visit Edward in Chicago beginning "after school on the last day of school until the Wednesday immediately preceding Thanksgiving, provided that the children are with Edward for a minimum of three (3) nights." Concerning winter break, the guardian *ad litem* recommended that the children visit Edward in Chicago beginning "after school on the last day of school through Christmas Eve, provided that the children are with Edward for a minimum of three (3) nights."

¶ 12                                B. Relocation Hearing

¶ 13    Belinda's petition to relocate proceeded to an evidentiary hearing. Belinda testified on May 31, 2019, and Edward testified on June 5, 2019. While Belinda was represented by an attorney, Edward represented himself. Before the hearing, the parties agreed to several trial stipulations, including that numerous exhibits would be admitted into evidence.

¶ 14                                1. Belinda's Testimony

¶ 15    Belinda testified that she was 41 years old and lived in Chicago's Lakeview neighborhood with her husband, Derek Stephenson, whom she married in May 2018. E.M. was now nine years old and N.M. was seven years old. Stephenson, who did not have any children of his own, was an IT analyst and made around $55,000 per year. Belinda was an attorney with an LLM in taxation and licensed to practice in Illinois, Texas, Pennsylvania and New York. She was previously employed by General Electric in its transportation division as an executive corporate counsel, but Wabtec had recently acquired General Electric's transportation division. Because an existing employee at Wabtec already performed the same tasks as Belinda and that employee was based in Pittsburgh at Wabtec's headquarters, she feared she would "probably" be laid off soon. In fact, her boss at General Electric was laid off after the acquisition due to workplace redundancy and other

former executives at General Electric had their positions eliminated. Wabtec's general counsel also indicated that there would be additional layoffs in the legal department. At the time, Belinda earned approximately $225,000 per year.

¶ 16   Because Belinda feared being laid off, she had applied to other legal positions in Illinois, but had not received any interviews. She also expanded her legal search to Texas, where multiple members of her family lived, including her sister and aunt. Belinda had no family in Chicago. Professionally, Belinda also believed that Texas was a better opportunity for her because she had multiple contacts there and General Electric's oil and gas business was based in Houston. Her employment search in the Houston area fared better than in Chicago, where she received multiple phone interviews and had done an in-person interview in April 2019. Based on her job prospects and family connections in the Houston area as well as other factors such as a lower cost of living and better school choices, Belinda believed that relocating to Pearland, Texas, would be in the best interests of her children. Belinda noted that she already knew what subdivision in Pearland she wanted to move to and had visited three of the elementary schools within that subdivision: Laura Ingalls Wilder Elementary School, Shirley Dill Brothers Elementary School and Glenn York Elementary School. Based on her visits, Belinda preferred Laura Ingalls Wilder Elementary School and even begun to look at houses that fed into the school. All three elementary schools were in the Alvin Independent School District.

¶ 17   According to Belinda, she was the primary caretaker of both children. She transported the children to and from school, to and from their extracurricular activities, to and from their medical appointments, and only she attended parent-teacher conferences. Belinda asserted that she paid for the children's health insurance as well as all of their medical, dental, school and extracurricular expenses. Although Edward was supposed to pay $400 per month in child support, Belinda stated

that he was currently behind in those payments. At one point, Belinda petitioned the court for sole custody of the children because Edward stopped complying with the joint parenting agreement and "wasn't really agreeing to visit the kids." But Belinda and Edward were able to agree to a revised schedule, so she withdrew the petition for sole custody.

¶ 18    Under the revised schedule, the children slept over at Edward's two Saturday nights per month, and on the weekends when they did not sleep over, Edward would have the children for a few hours on Sunday. However, according to Belinda, that schedule had recently changed because Edward had a new job. She explained that his "schedule is kind of chaotic because he wouldn't tell [her] when he was working" and his parenting time had not been constant, though the children did recently sleep over at his house. Although the joint parenting agreement allowed Edward to take the children for two weeks during the summer, Belinda stated that he never did so. Belinda, meanwhile, frequently took the children on vacations. Also despite the joint parenting agreement, on Thanksgiving, the children always remained with Belinda, but sometimes they would stay overnight with Edward before Thanksgiving or the weekend following Thanksgiving. Around Christmas, the children would stay with Edward from December 23rd to December 24th, and then, they would stay with Belinda from the 24th onward. Belinda added that, at times, Edward would cut his parenting time short, including during Christmas 2016, and whenever she would request that Edward take the children for a longer period of time, he would refuse. Overall, Belinda characterized the children's relationship with Edward as a "good" one and acknowledged if she relocated to Texas, they would miss him. But Belinda asserted that the children could always call or video chat with Edward and have "regular visitation" with him.

¶ 19    When Belinda's attorney asked her about the guardian *ad litem* report, which was admitted into evidence, Belinda asserted that she generally agreed with the report. But she disagreed with

the guardian *ad litem*'s proposed schedule for parenting time, noting that it provided Edward twice the parenting time he currently had. As a result, Belinda requested some modifications to the proposed schedule. Initially, Belinda requested the removal of any Labor Day weekend visits to Chicago because Labor Day was only two weeks after the school year in Texas began, and it would be disruptive to her children to travel so soon after the school year began. Belinda also requested the removal of any spring break visits to Chicago because she often took the children on vacation during their spring break. Additionally, Belinda believed the proposed visits by Edward to Texas in June through December were unnecessary given that the guardian *ad litem* also recommended that the children spend time in Chicago during those months. Belinda pointed out that, if the guardian *ad litem*'s recommendations were followed, Edward could potentially have parenting time with the children in either Texas or Chicago every weekend from June 15th until early August when school began. Belinda observed that, even if her requested modifications were granted, Edward would still have more parenting time than he currently had.

¶ 20    Belinda testified that a roundtrip flight to Houston booked approximately a month in advance cost around $250 and hotels in the area cost about $80 to $90 per night. Given the travel costs, Belinda had concerns about the guardian *ad litem*'s recommendation that she be required to pay for all travel costs associated with Edward exercising his parenting time, especially because the recommendation did not restrict the type of hotel or airfare.

¶ 21                                 2. Edward's Testimony

¶ 22    Edward testified that he lived in Chicago with his wife, Amarki Acosta Medina whom he married in the Dominican Republic in October 2012, and their four-year-old daughter, J.M. Edward stated that E.M. and N.M. had a great relationship with J.M., and they told him that they would miss seeing J.M. if they relocated, an assertion that was echoed by the guardian *ad litem*'s

report. Edward worked for AT&T from 2013 until March 2019 in a sales position that had forced overtime and an everchanging schedule, which he explained was why he saw his children mostly on weekends and oftentimes could not spontaneously have parenting time with them when Belinda would request it. But Edward also stated that, when he would spontaneously ask Belinda to see the children, she would reject the request and say they were too busy. Edward remarked that he had "tried multiple times, hundreds of times to get the kids extra hours, and she's always shot that down." Edward agreed with Belinda's characterization of his current parenting time schedule.

¶ 23     Edward acknowledged that he did not attend parent-teacher conferences in the current school year and only attended his children's extracurricular activities limited times. Edward likewise conceded that he did not take his children to medical appointments except for one time two years ago. Although Edward asserted he had taken the children on a summer vacation to a Wisconsin waterpark, he acknowledged never taking them on a two-week vacation. He mostly did day trips with his children, such as to the Botanic Gardens. According to Edward, it was a money issue, and he remarked that, "[i]f [he] had money, [he] would love to take them somewhere." Edward conceded that, during the summer of 2018, Belinda had asked him to take the children for two weeks, but he declined. Edward explained that he could not take them for such a long period of time due to his work schedule and Medina's work schedule. Edward also stated that he took the week of April 2 to April 6, 2018, off from work and went on a vacation to the Dominican Republic with Medina and J.M. to visit Medina's family, but he did not take E.M. or N.M. According to Edward's financial affidavit, April 3 was his birthday.

¶ 24     Recently, Edward left his position at AT&T for a position with the Cook County Sheriff's Office as a telecommunicator. But Edward quit this position during a probationary period, which was only seven days before the second day of the relocation hearing. During this period of

unemployment, Edward did not ask Belinda for more parenting time. Currently, Edward made $1800 a month in rent from renting out two apartments in a multi-family building he had purchased years before. When he took the position with the Cook County Sheriff's Office, his expected salary was about $60,000. In 2018, Edward made $53,244 working for AT&T, and in 2017, Edward made nearly $80,000 working there. Edward explained that he had better sales numbers in 2017 as compared to 2018, and in 2018, he only worked for 11 months because he took a leave of absence from work for one month due to stress.

¶ 25   During the hearing, Belinda's attorney showed Edward an exhibit detailing his income from AT&T during the 2018 calendar year. The exhibit did not show any compensation from the middle of July 2018 until the beginning of October 2018. Although Edward reiterated that he took a month off in 2018 for work stress, he also stated he "used some vacation time there." His parenting time schedule during this period did not change. At the time of the hearing, Edward had applied for various jobs and had multiple interviews, including at Verizon and CDW. He also indicated that he was contemplating returning to school to get a bachelor's degree, but paying for tuition was an issue. Medina also was not working at the time of the hearing, and Edward acknowledged being late on his child support payments. Edward also stated that he was planning on filing for bankruptcy, but was waiting until he had dealt with the relocation issue first. Edward highlighted the proposed parenting time schedule by the guardian *ad litem*, but found it unrealistic due to the unpredictability of his potential work schedule—a schedule he noted would require him to have weekends off. Edward asserted that he would be willing to move to the Houston area to be closer to his children, but he did not have the money for it presently.

¶ 26   As noted, in addition to the guardian *ad litem*'s report being admitted into evidence, several other exhibits were, too. These included school records documenting which parent the children's

teachers had interacted with most and which parent picked the children up from school on each day. The exhibits also included various financial information of both Edward and Belinda, and report cards of various schools in Chicago and Pearland. One of the school report cards, the 2017-2018 report card for Shadow Creek High School, which was part of the Alvin Independent School District, included an academic calendar for the 2018-2019 school year. According to the calendar, elementary, junior high and high school students in the Alvin Independent School District were scheduled to have "STAAR Testing" from April 9 through April 12. According to the Alvin Independent School District's website, STAAR testing is the state standardized testing.[1]

¶ 27                                3. Closing Arguments

¶ 28    Following the hearing, the trial court invited both parties to submit written closing arguments. Belinda submitted one and spent the majority of it focused on whether relocation to Pearland was in the best interests of her children. Belinda did comment on the guardian *ad litem*'s recommendations for Edward's parenting time if the court allowed her to relocate. She first argued that there had to be some limit for her responsibility to pay for the transportation costs associated with Edward exercising his parenting time. Belinda requested a $4000 yearly limit for her contributions toward the children's transportation costs to Chicago, which, according to her, would equate to approximately eight visits. Belinda also stated that she would pay for any unaccompanied minor fees or the cost for an adult accompaniment for the children, if necessary. Additionally, Belinda requested a yearly limit of $1000 in reimbursements to Edward for his travel to Texas.

---

[1] We may take judicial notice of the Alvin Independent School District website because, as a government website, information contained thereon are sufficiently reliable. See *Kopnick v. JL Woode Management Co.*, LLC, 2017 IL App (1st) 152054, ¶ 26.

¶ 29    In Belinda's proposed parenting time schedule, Edward would be allowed to travel to Texas one weekend per month from January until May, and the children would be allowed to visit him in Chicago on President's Day weekend, Memorial Day weekend, Father's Day weekend, Columbus Day weekend, three full weeks over the summer but no more than two consecutively, part of Thanksgiving break (but not on Thanksgiving), and part of winter break (but not on Christmas). The record does not show that Edward submitted a written closing argument.

¶ 30                              4. Trial Court's Judgment

¶ 31    On June 14, 2019, the trial court entered a judgment on Belinda's petition to relocate. When the court discussed various factors related to whether relocation was in the best interests of the children, it noted that both Belinda and Edward were sincere and genuine while testifying, and both only wanted what was best for their children. The court observed that, while Belinda desired a chance to seek out better career opportunities, be closer to her family and give the children a better lifestyle, Edward wanted the children to remain in Chicago so that he could continue to spend weekly time with them and make sure they grew up having a strong relationship with J.M. The court highlighted that relocation would undoubtedly have a significant impact on the children and if it allowed relocation, the court would have to ensure that it "minimize[d] the impact." The court remarked that minimizing the impact could be achieved, in part, by "allowing [Edward] significant parenting time in both Texas and Chicago (greater than or equal to the parenting time he currently exercises)."

¶ 32    The trial court further noted that, although Edward did not come to every extracurricular activity of the children, "they still will need regular contact with him" as well as J.M. and weekly visits would be out of the question if relocation were granted. The court observed that, "because of the disparity of income it would be difficult for [Edward], on his own, to maintain regular, in-

- 12 -

person contact with the children." But because of Belinda's "superior resources" and "judicious application" of them, "a schedule could be fashioned where the children see both their father and [half-]sister at least monthly as well as on holidays and school breaks." The court believed that a "more generous" parenting time schedule for Edward than what he currently had could obviate the negative consequences with the children relocating to Texas.

¶ 33    The trial court ultimately found that granting Belinda's petition to relocate to Pearland was in the children's best interests. After making this finding, the court entered a modified parenting time schedule and ordered that Edward, accompanied by J.M., must have one weekend visit per month of his choosing with his children in Texas. The court also ordered that his children must spend the following weekends in Chicago with him: Memorial Day weekend, Father's Day weekend, Columbus Day weekend, President's Day weekend and the weekend closest to Edward's birthday "provided such weekend does not fall within the first month of school." Concerning Thanksgiving break, the court determined that Edward must have at least two consecutive nights of his choosing with his children in Chicago, but he could not "choose the actual Thursday of Thanksgiving more than two consecutive years." Concerning winter break, the court determined that Edward must have at least three consecutive nights of his choosing with his children in Chicago, but he could not "choose the actual day of Christmas more than two consecutive years." Additionally, the court awarded Edward parenting time with his children in Chicago during spring break in odd-numbered years and two consecutive weeks during the summer. The court also restricted Edward's choice of weekends in Texas so that they could not fall on Belinda's birthday, Mother's Day, Labor Day, her winter break time, her spring break time or her Thanksgiving break time unless she consented.

¶ 34    Regarding the costs associated with Edward exercising his parenting time, the trial court found that, "[d]ue to the disparity in income between the parties," Belinda would be financially responsible for the costs of Edward and J.M.'s travel to Texas along with reasonable hotel costs, and the costs of the children's travel to Chicago. The court capped these costs at $15,000 per year and "advise[d] each party to be frugal with the transportation and hotel costs." Although not specifically in reference to making Belinda financially responsible for up to $15,000 in transportation-related costs per year, the court noted in various places in the judgment the disparity of finances between Edward and Belinda.

¶ 35    In discussing whether to assess any of the past costs for child care and the children's extracurricular activities against Edward, which had not been apportioned by the parties' original marital settlement agreement, the court observed that, "[e]ven imputing a minimum wage salary to Edward and not factoring in [Stephenson's] income, there is still a significant income disparity (a factor of 6 or more)." The court ultimately declined to assess any of these past costs against Edward. In discussing how to assess any future costs for child care and the children's extracurricular activities, the court determined that the parties would pay for any extracurricular activities in which they enrolled the children and the parties would pay for any child care costs associated with exercising their respective parenting time. The court acknowledged that Belinda would bear the majority of these expenses but reasoned that Texas had a lower cost of living and "the income tax savings alone are equal to nearly 5% of [Belinda's] gross income."

¶ 36    Belinda subsequently appealed.

¶ 37                                                    II. ANALYSIS

¶ 38    Before addressing the merits of Belinda's contentions on appeal, we note that Edward has not filed a brief in this appeal as the appellee. However, in light of the claimed errors and the record

being straightforward, we may resolve the appeal without the aid of an appellee's brief. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976). We now turn to Belinda's first contention on appeal.

¶ 39                                    A. Excessive Parenting Time

¶ 40     Belinda first contends that the trial court granted excessive parenting time to Edward as a result of the relocation, in particular his monthly parenting time in Texas from June to December, his parenting time rights over Thanksgiving and winter breaks, and his parenting time over the weekend closest to his birthday. Belinda asserts that, under the parties' joint parenting agreement that was incorporated into the dissolution of marriage judgment and the more recently modified schedule, Edward never had close to the amount of parenting time the court granted him as part of the relocation judgment. As highlighted by Belinda, under the modified schedule, the children slept over at Edward's house one night on the weekend every two weeks (or approximately 24 overnights per year), and on the weekends when they did not sleep over, Edward would have them for a few hours on Sunday. According to Belinda, the court more than doubled Edward's parenting time when it granted her petition to relocate, which was not justified based upon the evidence presented at the hearing.

¶ 41     Under section 602.7(b) of the Act (750 ILCS 5/602.7(b) (West 2018)), there are several factors the trial court must consider when allocating parenting time between the parents, including "the wishes of each parent seeking parenting time," "any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child," and "the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement." "A reasonable visitation schedule is one that will preserve and foster the child's relationship with the

- 15 -

noncustodial parent." *In re Marriage of Eckert*, 119 Ill. 2d 316, 327 (1988).[2] The ultimate inquiry, however, is what is in the children's best interests. 750 ILCS 5/602.7(a) (West 2018). A determination about children's best interests is heavily fact dependent and must be considered on a case-by-case basis. *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32.

¶ 42      Because the trial court has the opportunity to observe the witnesses testify, it is in the superior position to judge their credibility and ultimately determine the best interests of the children. *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 15. As such, there is a strong presumption in favor of the trial court's ruling. *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32. Given the great deference afforded to the trial court, its determination concerning the allocation of parenting time will not be disturbed "unless the court abused its considerable discretion or its decision is against the manifest weight of the evidence." *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 15; see also *In re Marriage of Mayes*, 2018 IL App (4th) 180149, ¶ 57 (same). An abuse of discretion occurs when a finding is arbitrary or unreasonable such that no reasonable person would adopt the same view as the court. *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009). A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly evident. *In re A.P.*, 2012 IL 113875, ¶ 17.

¶ 43      In arguing that the trial court granted excessive parenting time to Edward, Belinda cites *In re Marriage of Fatkin*, 2019 IL 123602, ¶¶ 4, 20, *In re Marriage of Kavchak*, 2018 IL App (2d) 170853, ¶¶ 56, 58, *Williams v. Williams*, 2018 IL App (5th) 170228, ¶¶ 4, 55, *In re Marriage of Kincaid*, 2012 IL App (3d) 110511, ¶ 19, *In re Marriage of Eaton*, 269 Ill. App. 3d 507, 512 (1995)

---

[2] The term "parenting time" replaced the term "visitation" in the Act in 2016. See 750 ILCS 5/801(e) (West 2018).

and *In re Marriage of Gratz*, 193 Ill. App. 3d 142, 149-50 (1989). Belinda argues these cases generally stand for the proposition that, when courts allow one parent to relocate, they award the non-relocating parent similar overall parenting time, but less frequently and in more extended periods of time. The fact that six decisions spanning 30 years support Belinda's general proposition of similar parenting time pre-relocation and post-relocation does not mean the same should occur in this case. Critically, we must adhere to the undisputed principle in family law cases where a determination about the best interests for children is heavily fact dependent and must be considered on a case-by-case basis. See *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32. Because of the fact-intensive inquiry, there is no bright-line test, and "therefore, citation to and discussion of prior removal cases is of little value." *In re Marriage of Berk*, 215 Ill. App. 3d 459, 465-66 (1991).[3] Moreover, "rarely will the facts and circumstances in two separate removal cases be comparable." *In re Marriage of Johnson*, 352 Ill. App. 3d 605, 616 (2004). We now address each of Belinda's specific arguments.

¶ 44                    1. Monthly Parenting Time in Texas from June Through December

¶ 45    Belinda first argues that the trial court's award to Edward of parenting time in Texas from June through December was excessive given his parenting time with the children in Chicago during those same months.

¶ 46    Although the trial court may have granted Edward more parenting time than he had previously as a result of the relocation, in part because of the monthly visits to Texas between June and December, the court observed that the impact of relocation on the children could be mitigated by awarding Edward more parenting time with his children than he had before. Although this court

---

[3] The term "removal" was the prior term used by the Act, but now the term "relocation" is used. See *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 28.

has acknowledged that a reduction in parenting time to the non-relocated parent might be an unavoidable consequence of granting a relocation petition (see *In re Marriage of Demaret*, 2012 IL App (1st) 111916, ¶ 60), there is nothing inherently unreasonable about granting more parenting time to the non-relocated parent. Certainly, by Edward's own admissions during the hearing, he has not been the most attentive father. But "[m]atters of visitation *** are not to be used as means of punishing either parent" (*Hock v. Hock*, 50 Ill. App. 3d 583, 584 (1977)), and as the court noted in its judgment granting relocation, Edward testified credibly and sincerely, and truly desired to spend time with children and for them to spend time with J.M. The court believed that the monthly parenting time in Texas from June through December (in addition to January through May) would preserve and foster the children's relationship with Edward given how far away they would be relocating. See *In re Marriage of Eckert*, 119 Ill. 2d at 327 ("A reasonable visitation schedule is one that will preserve and foster the child's relationship with the noncustodial parent.") Although the children may also be spending time in Chicago with Edward during the months of June through December, we cannot say the court's award of parenting time to Edward in Texas those months was unreasonable or the opposite conclusion was clearly evident.

¶ 47    Although Belinda posits that Edward did not even request to go to Texas every month for parenting time, the guardian *ad litem* recommended that Edward have monthly parenting time in Texas, and when discussing those recommendations at the hearing, Edward never raised a specific objection to those monthly visits, as he did with potentially having the children two consecutive weeks during the summer. During the hearing, in regard to the possibility of having the children for two weeks during the summer, Edward stated:

"As far as the two weeks, if she does go to Texas, it's going to have to depend on my schedule. She can't—they can't just come two weeks. It depends on what—

who is going to watch them? What days am I working? *** It's not that easy to,

hey, I am going to send the kids for two weeks. They can't stay home alone."

Though Belinda argues this demonstrated that Edward did not want additional time with his children in the summer, that is an exaggeration of Edward's testimony. Edward did not flat out reject the possibility of having the children for two weeks during the summer, but rather was worried about his potential work schedule and having someone able to watch his children during a potential two-week visit. Importantly, in awarding Edward two weeks of parenting time during the summer, the trial court added: "If Edward chooses to exercise his summer weeks, he shall provide to Belinda his choices by March 1st of each year in order to allow for camp enrollment planning and/or summer programs for the children." That is to say, if Edward cannot commit to exercising two weeks of parenting time with his children in the summer, Belinda would have advance notice of his refusal. Consequently, as a whole, we cannot find that the trial court abused its considerable discretion in awarding Edward monthly parenting time in Texas from June through December and cannot find the award to be against the manifest weight of the evidence.

¶ 48                                    2. Edward's Birthday Weekend

¶ 49     Belinda next argues that the trial court erroneously awarded Edward parenting time in Chicago with the children over the weekend closest to his birthday because such a visit would fall right before STAAR testing in the Alvin Independent School District.

¶ 50     According to Edward's financial affidavit, which was admitted into evidence at the relocation hearing, his birthday is April 3. According to the academic calendar for the 2018-2019 school year for the Alvin Independent School District, also admitted into evidence, elementary, junior high and high school students were scheduled to have STAAR testing from April 9 through April 12. We further note that, according to the Alvin Independent School District website, of

which we can take judicial notice (see *Kopnick v. JL Woode Management Co.*, LLC, 2017 IL App (1st) 152054, ¶ 26), STAAR testing was scheduled for April 6 through April 9 in the 2019-2020 academic year and is scheduled for April 6 through April 9 in the 2020-2021 academic year. In 2019, Edward's birthday fell closest to the weekend of April 6 and 7, the weekend immediately preceding STAAR testing. See *Roberts v. Sisters of Saint Francis Health Services, Inc.*, 198 Ill. App. 3d 891, 901 (1990) (finding judicial notice may be taken on matters of common knowledge, including "[c]alendar dates and corresponding days of the week"). In 2020, Edward's birthday fell closest to the weekend of April 4 and 5, the weekend immediately preceding STAAR testing. And in 2021, Edward's birthday will fall closest to the weekend of April 3 and 4, again the weekend immediately preceding STAAR testing. Based on these three years, the weekend closest to Edward's birthday consistently falls immediately before STAAR testing.

¶ 51     We agree with Belinda that having the children travel to Chicago and back to Texas the weekend before state standardized testing is not in their best interests. Notably, the guardian *ad litem* did not recommend that the children visit Edward on his birthday weekend and Edward himself never made that request. See 750 ILCS 5/602.7(b)(1) (West 2018) (listing several factors the trial court must consider when allocation parenting time including "the wishes of each parent seeking parenting time"). Moreover, in 2018, from Monday, April 2 through at least Friday, April 6, Edward acknowledged taking a vacation to the Dominican Republic without E.M. and N.M. Curiously, when the trial court awarded Edward parenting time with the children in Chicago over the weekend closest to his birthday, the court noted that the award stood unless that weekend fell "within the first month of school." Edward's April 3 birthday was stated in his financial affidavit, which was admitted into evidence, thus it appears the court awarded Edward this weekend without knowing the actual date of his birthday. Although we cannot expect the court to be clairvoyant and

cannot fault the court for not knowing that STAAR testing would consistently follow the weekend closest to Edward's birthday, the evidence at the relocation hearing did show that, in 2019, Edward's birthday fell closest to the weekend immediately before STAAR testing. It is inconceivable that allowing E.M. and N.M. to travel back and forth between Texas and Chicago over the course of 72 hours the weekend before state standardized testing would be in their best interests. Consequently, we find that the trial court's award of parenting over the weekend closest to Edward's birthday was an abuse of discretion and against the manifest weight of the evidence.

¶ 52                    3. Thanksgiving and Winter Break Schedule

¶ 53    Belinda next argues that the trial court's award of parenting time to Edward over Thanksgiving break and winter break was unreasonable because it allowed Edward to have the children in Chicago for Thanksgiving and Christmas two years in a row when Edward never had those days with his children before. She further argues that the court's award to Edward of "[a]t least two consecutive nights" during Thanksgiving break and "[a]t least three consecutive nights" during winter break were unreasonable given that the language allowed Edward to have the children for the entirety of their Thanksgiving and winter breaks.

¶ 54    Under the joint parenting agreement, Edward and Belinda agreed that they would alternate the Thanksgiving holiday, and Edward would have the children on Christmas Eve while Belinda on Christmas Day. But, as previously noted, Edward and Belinda agreed to revise that schedule. Under the revised schedule, the children stayed with Belinda every year on Thanksgiving. Sometimes before Thanksgiving they would stay with Edward or sometimes after, they would stay with Edward, but Belinda always had them on Thanksgiving. And around Christmas, the children slept over at Edward's house from December 23 until December 24, and they returned to Belinda's early in the afternoon on December 24. Given the history between the parties, where Belinda

always had the children on Thanksgiving and Christmas Day, we agree that the trial court's decision to allow Edward to have the children potentially both Thanksgiving and Christmas Day in two consecutive years is not only unreasonable but also contrary to the established evidence from the hearing. See 750 ILCS 5/602.7(b)(4) (West 2018) (when allocating parenting time between parents, the trial court must consider any prior agreement and course of conduct between the parents).

¶ 55    Under the trial court's parenting time schedule, Edward could have Thanksgiving and Christmas Day with his children in 2020 and 2021, and then again in 2023 and 2024, meaning he could have these two holidays 67 percent of the time. The disproportionate amount of time awarded to Edward on these holidays may have been the court compensating for Belinda having the vast majority of the parenting time of the children, which under certain circumstances may be justifiable. But it is not in this case where the uncontradicted evidence showed that Edward did not exercise parenting time with the children on Thanksgiving or Christmas Day. Notably, the guardian *ad litem* did not even recommend that Edward be allowed to have parenting time with his children on Thanksgiving or Christmas Day, only that he be allowed to spend time with them "after school on the last day of school until the Wednesday immediately preceding Thanksgiving" and "after school on the last day of school through Christmas Eve" provided that they are with Edward for at least three nights. While it is a reasonable position to allow Edward parenting time on both Thanksgiving and Christmas Day even in the face of the parties' past history given that the children were going to be relocating to Texas, allowing him to have them for Thanksgiving and Christmas Day two out of every three years was unreasonable under the circumstances.

¶ 56    Because we find the trial court's allocation of parenting time over Thanksgiving break and winter break to be unreasonable, we reverse those allocations and remand the matter for the court

to construct a more reasonable parenting time schedule for these two time periods. See *In re Marriage of Deem*, 328 Ill. App. 3d 453, 457 (2002) (finding the trial court's award of visitation to the father for the entire summer to be unreasonable and the extent of his summer visitation to "be left to the discretion of the trial court upon remand"). Belinda further highlights that the trial court's judgment did not require Edward to provide any notice to her before requesting the exercise of his parenting time in Chicago over Thanksgiving and winter breaks. We agree with Belinda in this regard that there must be some sort of notice requirement, but because we are already remanding the matter for a more reasonable parenting time allocation, the court can address this issue upon remand.

¶ 57                    B. Belinda's Requirement to Pay for J.M.'s Travel

¶ 58    Belinda next contends that the trial court exceeded its authority in granting visitation for J.M., the children's half-sister, in Texas and requiring Belinda to bear the associated transportation costs for J.M.

¶ 59    "Dissolution of marriage and collateral matters *** are entirely statutory in origin and nature." *In re Marriage of Henry*, 156 Ill. 2d 541, 544 (1993) "When a court's power to act is controlled by statute, the court is governed by the rules of limited jurisdiction [citation] and courts exercising jurisdiction over such matters must proceed within the strictures of the statute." *In re M.M.*, 156 Ill. 2d 53, 66 (1993). As such, the Act (750 ILCS 5/101 *et seq.* (West 2018)) controls the authority of the trial court with respect to all matters related to the dissolution of marriage, including the allocation of parenting time. *In re Marriage of Mitchell*, 319 Ill. App. 3d 17, 22 (2001). We review whether the trial court properly exercised subject-matter jurisdiction *de novo*. *In re John C.M.*, 382 Ill. App. 3d 553, 558 (2008).

¶ 60    Beginning with Belinda's argument that the trial court exceeded its authority in granting visitation to J.M., Belinda cites section 602.9 of the Act (750 ILCS 5/602.9 (West 2018)) and highlights that the Illinois legislature has afforded non-parents visitation rights under certain circumstances. Under section 602.9(c) of the Act, "[g]randparents, great-grandparents, step-parents, and *siblings* of a minor child who is one year old or older may bring a petition for visitation *** if there is an unreasonable denial of visitation by a parent that causes undue mental, physical, or emotional harm to the child and if at least one of the following conditions exists," including that the parents have been granted a dissolution of marriage and at least one parent does not object to the grandparent, great-grandparent, step-parent, or sibling having visitation with the child. (Emphasis added.) *Id.* § 602.9(c). Under this section of the Act, a sibling includes half-brothers and half-sisters. *Id.* § 602.9(a)(2). That is to say, section 602.9 of the Act, titled "visitation by certain non-parents," describes the circumstances in which certain non-parents may petition the court for court-ordered visitation time.

¶ 61    Given that the trial court's authority to act is controlled by Act and the Act expressly provides the circumstances for when the court can mandate visitation for a half-sibling, the court exceeded its authority in granting visitation for J.M. Despite the good intentions by the court in granting visitation to J.M., we cannot read into the statute a remedy that our legislature has not authorized. See *In re Marriage of Mitchell*, 319 Ill. App. 3d at 22. Furthermore, if the court cannot grant this visitation, it axiomatically cannot mandate that Belinda bear the associated transportation costs for J.M. to visit her half-siblings in Texas.

¶ 62    "A judgment entered by a court that lacked subject matter jurisdiction is void." *In re Marriage of Chrobak*, 349 Ill. App. 3d 894, 897 (2004). Accordingly, the portion of the relocation

judgment that ordered J.M. to be included on Edward's parenting time to Texas and ordered Belinda to pay for J.M.'s transportation costs is void and unenforceable.

¶ 63                                   C. Belinda's Financial Contribution

¶ 64      Belinda lastly contends that the trial court erred in requiring her to contribute up to $15,000 per year for the associated travel costs of Edward exercising his parenting time with the children in Texas and Chicago. We review the trial court's assessment of parenting-time related costs for an abuse of discretion. *In re Marriage of Patel*, 2013 IL App (1st) 112571, ¶ 67.

¶ 65      At the relocation hearing, evidence from parties demonstrated indisputably that the cost of living in Pearland, Texas, was much less than living in Chicago. Additionally, Edward did not have a bachelor's degree and, at the time of the hearing, was unemployed as he had recently quit a job with the Cook County Sheriff's Office. Had he successfully completed his probationary period, the position would have paid him nearly $60,000 per year. Edward did, however, earn $1800 a month in rental income. In 2018, Edward made approximately $53,000 working for AT&T, and in 2017, Edward made approximately $80,000. Though, in 2018, Edward had a gap of nearly three months of not being paid by AT&T, which he explained at the hearing was because of a combination a leave of absence due to stress and "us[ing] some vacation time." Belinda, meanwhile, testified that she made approximately $225,000 in her current position as an executive corporate counsel. Belinda was well-educated having obtained both a law degree and an LLM in taxation as well as being licensed as an attorney in four states, including Illinois and Texas.

¶ 66      It is true, as Belinda notes, that she may not make $225,000 while living in Pearland at a possible new job, but the trial court's observation that she made significantly more than Edward was based on the evidence, where Edward's yearly income had been trending down ever since 2017. Belinda, however, cites *In re Marriage of Hubbs*, 363 Ill. App. 3d 696, 705 (2006) and

argues that, given the circumstances of the case, the trial court had a duty to view their relative financial positions based upon past history and income potential, not merely their current status which could change any moment. But even ignoring the current financial positions of Belinda making $225,000 and Edward being unemployed, Belinda is an attorney with an LLM in taxation licensed already in Texas and Edward has not yet obtained a bachelor's degree. Moreover, as previously noted, past history indicates that Edward's yearly income has been decreasing since 2017. Belinda undoubtedly has the higher earning capacity and higher income history.

¶ 67    Given the past and current significant income disparity between Edward and Belinda, the significant disparity in income potential between the two, and the lower cost of living in Pearland compared to Chicago, we cannot say the trial court's requirement of Belinda to contribute up to $15,000 per year for the associated travel costs of Edward exercising his parenting time with the children in Texas and Chicago was so arbitrary or unreasonable such that no reasonable person would adopt the same view as the court. We likewise cannot say there was no basis for the finding in the evidence. If Belinda did have a significant reduction in income, she could file a motion with the court to modify the parenting time and necessarily her required contributions based on these changed circumstances. See 750 ILCS 5/610.5 (West 2018); see also *In re Marriage of Adams*, 2017 IL App (3d) 170472, ¶ 18 ("Parenting time may be modified at any time, upon the showing of changed circumstances"). But, as of the hearing and the status of the parties at that time, we cannot say the trial court abused its discretion in requiring her to contribute up to $15,000 per year or that finding was against the manifest weight of the evidence.

¶ 68    Still, Belinda asserts that the trial court did not specify what portion, if any, Edward would pay of the travel costs that exceed $15,000. The court's judgment on the travel costs stated:

"Due to the disparity in income between the parties, Belinda will cover the cost of Edward and JM's monthly travel to Texas and reasonable hotel costs (assuming the children will stay overnight with Edward and JM at the hotel). Belinda will also cover the costs of the children's travel to Chicago. Travel costs will be capped at $15,000 per year and the Court advises each party to be frugal with the transportation and hotel costs. *** Absent an agreement of the parties, Edward will communicate a date and approximate time he wishes to travel (according to the time parameters set out [previously] and Belinda shall make the flight arrangements."

Based on our reading of the court's judgment, any transportation costs associated with Edward exercising his parenting time (either him traveling to Texas or the children traveling to Chicago) that exceeds $15,000 would be Edward's responsibility.

¶ 69    However, we note that the trial court's $15,000 cap of transportation costs included Belinda being required to pay for 12 roundtrip flights to and from Houston for J.M., an order we found was void and unenforceable. As Belinda testified to during the relocation hearing, a roundtrip flight to and from Houston booked approximately a month in advance cost around $250, meaning J.M.'s airfare costs to Houston would have totaled approximately $3000. Because Belinda has no financial responsibility any longer to transport J.M. to and from Houston, we will deduct $3000 from Belinda's required contribution, leaving her financially responsible for $12,000 of Edward's associated transportation costs to exercise his parenting time.

¶ 70                                        III. CONCLUSION

¶ 71    In sum, we reverse the trial court's award of parenting time to Edward on the weekend closest to his birthday. We also reverse the trial court's parenting time schedule over Thanksgiving

break and winter break, but remand the matter so that the court can create a more reasonable schedule over these time periods consistent with our findings herein. In addition, we reverse the portions of the relocation judgment that mandated visitation for J.M. and that Belinda bear the associated transportation costs. And finally, we reduce Belinda's contribution cap for transportation costs by $3000, resulting in her being responsible for up to $12,000 per year. We affirm the relocation judgment in all other respects.

¶ 72    For the foregoing reasons, we affirm in part, reverse in part and remand the matter.

¶ 73    Affirmed in part; reversed in part and remanded.